## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ADVANTUS, CORP.,

       Plaintiff,

v.                               Case No.  3:18-cv-1368-J-34JRK

SANDPIPER OF CALIFORNIA, INC.,
n/k/a DBJ Enterprises, Inc., PIPERGEAR
USA, INC., and INNOVAPRO
CORPORATION,

       Defendants.

_____

## <u>O R D E R</u>

**THIS CAUSE** is before the Court on several motions. Plaintiff Advantus, Corp. initiated this action on November 16, 2018, by filing a five count Complaint and Demand for Jury Trial (Doc. 1) against Defendants Sandpiper of California, Inc. n/k/a DBJ Enterprises, Inc. (Sandpiper), PiperGear USA, Inc. (PiperGear), and Innovapro Corporation (Innovapro). On January 28, 2019, each Defendant filed a motion seeking dismissal or transfer of this action. <u>See</u> Innovapro Corporation's Motion to Dismiss (Doc. 20; Innovapro Motion); Defendant PiperGear USA, Inc.'s Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 22; PiperGear Motion); Defendant Sandpiper of California, Inc.'s Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 23; Sandpiper Motion). Defendants argue that dismissal is warranted because this Court lacks personal jurisdiction over them. Alternatively, Defendants request the transfer of this action to the Southern District of California as a more convenient forum pursuant to 28 U.S.C. § 1404(a). Innovapro also moves to dismiss the Complaint for improper venue and

pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)), for failure to state a claim.   On June 28, 2019, following limited-purpose discovery on the issue of personal jurisdiction, Advantus filed Plaintiff's Amended Consolidated Response to Defendants' Motions to Dismiss (Doc. 87; Response).   Thereafter, with leave of Court, each Defendant filed a reply.   See Defendant Sandpiper of California, Inc.'s Reply to Plaintiff's Opposition to its Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 88; Sandpiper Reply); Innovapro Corporation's Reply in Support of Motion to Dismiss (Doc. 89; Innovapro Reply); Defendant PiperGear USA, Inc.'s Reply to Plaintiff's Opposition to its Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 91; PiperGear Reply), all filed on July 10, 2019.   In accordance with the Court's instructions, Advantus filed a consolidated sur-reply on August 23, 2019.   See Plaintiff, Advantus, Corp.'s Sur-Reply (Doc. 101; Sur-Reply). Accordingly, this matter is now ripe for review.

## I.   Standard of Review

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true.   See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n 1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).   In addition, all reasonable inferences should be drawn in favor of the plaintiff.   See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam). Nonetheless, the plaintiff must still meet some minimal pleading requirements.   Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted). Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted); see also BellSouth Telecomm., 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (citations and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 679. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

Additionally, in considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the "plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." See United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009). Where a defendant "challenges jurisdiction by submitting affidavit

evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" See id. (quoting Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002)). In ruling on a motion to dismiss for lack of personal jurisdiction, a district court has discretion to conduct an evidentiary hearing. See Delong Equip. Co. v. Wash. Mills Abrasive Co., 840 F.2d 843, 845 (11th Cir. 1988). However, where the court does not conduct a hearing, "the plaintiff must present only a prima facie showing of . . . personal jurisdiction." Id.

A plaintiff makes a prima facie showing by presenting evidence sufficient to withstand a motion for directed verdict on the issue of personal jurisdiction. Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988). Thus, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits[,]" and "where the evidence presented by the parties' affidavits . . . conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff." Id. (citing Delong Equip. Co., 840 F.2d at 845); see also United Techs. Corp., 556 F.3d at 1274 (citing Polski Linie Oceaniczne v. Seasafe Transp. A/S, 795 F.2d 968, 972 (11th Cir. 1986)) (noting that, if the defendant rebuts the jurisdictional allegations in the plaintiff's complaint, "the plaintiff is required to substantiate [its] jurisdictional allegations [ ] by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint."). This construction in favor of the plaintiff is particularly necessary where, as in the instant case, the jurisdictional questions are intertwined with the merits of a case. See Delong Equip. Co., 840 F.2d at 845.

In accordance with this legal framework, the Court will summarize the facts alleged in the Complaint, and then review the substantial evidence put forth by the parties as to

- 4 -

the question of personal jurisdiction, all the while construing the alleged facts and evidence in favor of the non-moving plaintiff, Advantus. <u>Morris</u>, 843 F.2d at 492.[1]

## II. Background

### A. Summary of the Complaint

Advantus, a Florida corporation principally located in Jacksonville, Florida, manufactures and distributes products across five operating divisions. <u>See</u> Complaint ¶ 2. As relevant to this case, "Advantus manufactures backpacks, bug out bags, wallets, tactical gear, luggage, sports bags, tote bags, travel bags, and similar consumer products" under its Mercury Luggage and Mercury Tactical Gear brands. <u>Id.</u> ¶ 11. Defendants Sandpiper, PiperGear, and Innovapro, are California corporations, principally located in southern California, that manufacture or distribute similar products and target the same "customers and resellers" as Advantus. <u>Id.</u> ¶¶ 3-5, 11. As such, Advantus and Defendants are direct competitors and compete "for a common pool of customers, including merchandise buyers at Armed Forces Exchanges and Armed Forces servicemembers as end-user retail customers." <u>Id.</u> ¶ 11. In the Complaint, Advantus

---

[1] In support of their Motions, Defendants submitted declarations from James Wu, founder and vice-president of Innovapro, as well as David Jacobs, the owner of Sandpiper and PiperGear. <u>See</u> Declaration of James Wu in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Doc. 21; Wu Decl.); Declaration of David Jacobs, Corporate Representative, in Support of Defendant PiperGear USA, Inc.'s Motion to Dismiss or, in the Alternative, Transfer and Memorandum of Law (Doc. 22-1; Jacobs PiperGear Decl.); Amended Declaration of David Jacobs, Corporate Representative, in Support of Defendant DBJ Enterprises, Inc.'s Motion to Dismiss or, in the Alternative, Transfer and Memorandum of Law (Doc. 34-1; Jacobs Sandpiper Decl.). Advantus responds to these Declarations with declarations, deposition testimony, and substantial documentary evidence found at docket entries 45, 47, 54-55, 59-60, 74-85. Defendants filed additional declarations as well as documentary evidence with their Replies. <u>See</u> Declaration of David Jacobs in Support of Defendant DBJ Enterprises, Inc.'s Reply to Plaintiff's Opposition to its Motion to Dismiss or, in the Alternative, Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 88-1; Second Jacobs Sandpiper Decl.); Declaration of David Jacobs in Support of Defendant PiperGear USA, Inc.'s Reply to Plaintiff's Opposition to its Motion to Dismiss or, in the Alternative, Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 91-1; Second Jacobs PiperGear Decl.); <u>see also</u> Innovapro Reply, Ex. A (Doc. 95), Ex. B (Doc. 89-1), Ex. C (Doc. 96). Advantus also submitted further declarations and documentary evidence in connection with its Sur-reply. <u>See</u> Notice (Doc. 99), Ex. A (Doc. 102).

alleges that Defendants are subject to the jurisdiction of this Court "because they committed tortious activities within the state of Florida, caused harm to Advantus within the state of Florida while engaged in unlawful advertising within the state, and are engaged in substantial and not isolated business activities within the state of Florida." Id. ¶ 9.

The claims Advantus asserts in this action arise out of Defendants' alleged false advertising that their products were manufactured in the United States of America. Id. ¶ 1. According to Advantus, beginning in at least 2013, Sandpiper and PiperGear began advertising that their products were "made in the USA." Id. ¶ 12. In addition, Advantus alleges that Innovapro took-over the Sandpiper brand in 2018 and continued to engage in false advertising. Id. ¶¶ 31-32. In the Complaint, Advantus identifies the following alleged acts of false advertising:

- Beginning at least as far back as 2013 and continuing until at least January 2018, Sandpiper represented in the Frequently Asked Questions section of its website that "'[PiperGear] is our sister company based in Chula Vista, California. [PiperGear] produces US made sewn goods and product development with manufacturing solutions to meet US Government contract requirements including GSA and Berry Amendment.'" Id. ¶¶ 12, 13a. (alterations in original).[2]

- "From 2013 through at least 2017," Sandpiper and PiperGear used a symbol in their product catalog which depicted a United States flag with the word "USA" and purported to signify that the products were "'US Made: US manufactured products. Eligible for Berry Amendment, NAFTA and/or GSA requirements.'" Id. ¶ 13b.

- At some point, Sandpiper and PiperGear altered the legend for the flag symbol in its catalog "to read in small print at the bottom of the page 'US Made: If this symbol is in a description, it means we also offer the ability to make the product in the US (as well as the option of Berry and NAFTA

---

[2] According to the Complaint, the Berry Amendment, 10 U.S.C. § 2533a, "generally requires, among other things, that the Department of Defense purchase items containing only domestically-produced cotton, synthetic fibers, or textiles for contracts above a certain dollar value threshold." See Complaint ¶ 13h. According to Advantus, "[f]or items of 'individual equipment'" in Federal Supply Class 8465, such as duffel bags and backpacks, "the entire product, including all components and subcomponents, must be made in the United States." See id.

complaint [sic]),' . . . ." Id. ¶ 13c. Despite this change Sandpiper and PiperGear continued to use the flag symbol with the word USA "next to many foreign made products in a manner that implied US manufacture and would mislead the casual reader of the catalogue." Id. ¶ 13c.

- The "About" section of Sandpiper's Facebook page included the following statement: "'The growth and success of our US manufacturing is a great source of pride.'" Id. ¶ 13d. Significantly, this language remained on the Facebook page until at least mid-October of 2018, after Innovapro purchased the Sandpiper brand in August 2018. Id.

- Sandpiper and PiperGear "disseminated claims of the U.S. manufacture of their products directly to consumers throughout the United States using the internet and mails." Id. ¶ 13e.

- Online consumers on Amazon.com demonstrated confusion as to the country of origin of Sandpiper and PiperGear products. Id. ¶ 13f. According to Advantus, Sandpiper and PiperGear "knowingly allowed consumers to labor under the misbelief that many of [Sandpiper's] and PiperGear's products were manufactured in the USA without correcting this impression." Id. Sandpiper, PiperGear, and Innovapro have "failed to make online corrective statements to address the known consumer confusion thereby continuing to perpetuate the perception that many of their products are made in the USA when this perception is false." Id.

- Sandpiper "orally told merchandise buyers, including buyers at Armed Forces Exchanges, that its products were made in the United States to gain a competitive advantage over competitors who truthfully disclosed the non-United States origin of the competing products." Id. ¶ 13g. Advantus contends that these misrepresentations caused a "direct loss of sales to Advantus." Id.

- Sandpiper and PiperGear "represented that their bags, backpacks, and other products were compliant with the Berry Amendment despite the fact the products contained substantial foreign components and subcomponents." Id. ¶ 13h.

Advantus maintains that "[Sandpiper], PiperGear, and Innovapro's claims that their various products were made in the United States and/or were Berry Amendment compliant" were false. Id. ¶ 14.

Indeed, in the spring of 2018, the Federal Trade Commission (FTC) notified Sandpiper and PiperGear that it "had determined that nearly all of [Sandpiper's] and PiperGear's products are imported as finished goods or contain significant imported components despite PiperGear and [Sandpiper] having made express or implied claims that their products were manufactured in the United States of America." Id. ¶ 15. "As a result, the FTC served a proposed complaint on Sandpiper and PiperGear charging them with false advertising," and on September 12, 2018, the FTC filed a proposed consent order for public comment. Id. ¶¶ 17-18, Exs. A-B. Advantus, among others, "filed public objections to the proposed consent order on the basis that it was too lenient and requested the FTC to take tougher action." Id. ¶ 18. At the time the instant Complaint was filed, the FTC had not announced how it intended to proceed in light of the objections to the proposed consent order. Id.

Advantus also alleges that Innovapro, Sandpiper and PiperGear were part of a conspiracy to import goods into the United States and advertise them as "'Made in the USA.'" See Complaint ¶ 67. According to Advantus, Sandpiper promotes PiperGear as its "sister company" and these companies "share a common website, sandpiperca.com, as well as use joint catalogs to sell the products bearing their respective trademarks." Id. ¶ 31. Additionally, Advantus maintains that Innovapro "was the primary consignee of record for goods that [Sandpiper] imported into the United States for resale under the [Sandpiper] brand, and Innovapro imported virtually nothing but [Sandpiper] goods, including some shipments which contained PiperGear purchase order numbers." Id. ¶ 24. Advantus maintains that Innovapro knew that Sandpiper and PiperGear had advertised for years that PiperGear produced U.S.-made and Berry Amendment compliant

goods.  Id. ¶ 22.  Advantus alleges that Innovapro knew these advertisements were false because it had imported to the United States completed goods from China that bore PiperGear purchase order numbers.  Id. ¶ 23.  Therefore, Advantus maintains that "[u]pon information and belief, Innovapro, was . . . knowingly or negligently helping [Sandpiper] and PiperGear conceal the foreign origin of the various products that [Sandpiper] and PiperGear were then claiming to have manufactured domestically."  Id. ¶ 25.

Additionally, according to Advantus, on August 31, 2018, Innovapro "took over" the Sandpiper brand.  Id. ¶ 27.  Advantus alleges that this transaction was fraudulent and in furtherance of the conspiracy.  Id. ¶¶ 68, 75.  In support, Advantus contends that James Wu, the "principal owner" of Innovapro also has had an ownership interest in Sandpiper and the Chinese manufacturer.  Id. ¶¶ 19-20.  According to Advantus, the Defendants, "working in concert," caused Innovapro to file a UCC-1 Financing Statement against all of Sandpiper's assets "to create the appearance that Innovapro was an arms-length secured lender" to Sandpiper.  Id. ¶ 26.  Then, on August 31, 2018, "with no apparent exchange of consideration," Innovapro took over the Sandpiper brand and falsely represented to merchandise buyers that Sandpiper of California, Inc. had dissolved.  Id. ¶ 27.  Advantus alleges that Sandpiper of California, Inc. did not dissolve, but rather, "one of its principals, David Jacobs, signed a name change for Sandpiper of California, Inc. to change its name to DBJ Enterprises, Inc."  Id. ¶ 28. Although Jacobs signed the name change form on August 31, 2018, Sandpiper did not file the document with the California Department of State until October 5, 2018, "a few weeks after the FTC published its proposed consent order . . . ."  Id.  On September 5, 2018, Innovapro terminated its UCC-1 Financing

Statement which, in conjunction with Innovapro's take-over representations, "created the appearance that Innovapro had foreclosed on its secured interest, or otherwise used its secured interest to obtain ownership of the secured assets." Id. ¶ 30. However, Advantus maintains that this transaction "instead appears to have been a voluntary asset transfer from [Sandpiper] to Innovapro without an adversarial arms-length component to it." Id.

Following the asset purchase, "Innovapro continued to operate the business of [Sandpiper] in the same manner as [Sandpiper] operated prior to August 31, 2018." Id. ¶ 29. Specifically, "Innovapro continued operating the Sandpiper brand in the same fashion without change to: the Sandpiperca.com website, the Sandpiper personnel, the Sandpiper email addresses, and the Sandpiper phone number itself." Id. ¶ 31. According to Advantus, as of October 23, 2018, "the phone numbers remained the same, the emails were the same, the website was the same, the products were the same, the catalog was the same, some of the personnel were the same, and the factories manufacturing the products were the same." Id. Advantus contends that other than the change of corporate ownership, "there does not appear to be any other visible difference" between the operation of the Sandpiper business before and after the takeover. Id. As such, Advantus alleges that Innovapro is both directly liable for its own false advertising and liable as a successor to Sandpiper. Id. ¶ 32.

### B. Summary of the Evidence

#### 1. The Corporations

##### a. Sandpiper of California, Inc.

As stated above, prior to the asset-purchase, Sandpiper was a corporation, located in California, engaged in the sale and distribution of various products, including military-style backpacks and travel bags.   <u>See</u> Amended Declaration of David Jacobs, Corporate Representative, In support of Defendant DBJ Enterprises, Inc.'s Motion to Dismiss or, in the Alternative, Transfer and Memorandum of Law (Doc. 34-1; Jacobs Sandpiper Decl.) ¶ 6; <u>see also</u> Plaintiff's Notice of Filing Deposition Transcripts and Exhibits (Doc. 47; Notice), Exs. 2-3.   Sandpiper did not manufacture its own products, rather it engaged other companies to do so, including Defendant PiperGear, as well as Sun Fai Industrial o/b Sunray Industries Limited (Sun Fai), and Textiles Costa Bella.   <u>See</u> April 11, 2019 Deposition of David Bailey Jacobs (Doc. 55-2; Jacobs Dep.) at 28-29; Jacobs Sandpiper Decl. ¶ 7.   Significantly, Sandpiper and PiperGear shared a common owner, California resident David Jacobs, and operated out of the same building, separated by a dividing wall, in California.   <u>See</u> Jacobs Dep. at 10, 15-16, 19-20, 154; Jacobs Sandpiper Decl. ¶ 4.   Jacobs also owns Textiles Costa Bella, a factory located in Mexico.   <u>See</u> Jacobs Dep. at 23.

##### b. PiperGear USA, Inc.

PiperGear is a California corporation "in the business of manufacturing various fabric products, including backpacks."   <u>See</u> Jacobs PiperGear Decl. ¶ 3.   PiperGear does not sell any products to end-users under its own label, rather PiperGear manufactures and labels products on behalf of other companies, one of which was Sandpiper.   <u>Id.</u> ¶¶ 4, 23.

As such, "[a]fter delivery of these products, PiperGear has no influence or right regarding where the products are then taken or delivered to be sold." Id. ¶ 5. PiperGear does not conduct any business in Florida. Id. ¶ 8. Indeed, it does not operate any distribution centers or manufacturing plants in Florida, and it has not "sold products to, nor distributed products in, Florida." Id. ¶¶ 8, 12.

Jacobs started PiperGear as a "sewing company" in the second half of a building he owned after the existing tenant moved out. See Jacobs Dep. at 19-20.[3] Sandpiper was located in the other half of the building. See id. at 10. "At the time PiperGear was incorporated, [Sandpiper] loaned funds to PiperGear so PiperGear could begin doing business." See Second Jacobs PiperGear Decl. ¶ 2. Notably, approximately 20% of PiperGear's total manufacturing output was on behalf of Sandpiper. See Jacobs PiperGear Decl. ¶ 4. However, PiperGear's "Sales by Customer Summary" records for the years 2017 and 2018 do not list Sandpiper as a customer. See Jacobs Dep. at 22, 25, Exs. 47, 48. Jacobs explains that PiperGear sold bags to Sandpiper "in theory" meaning "[i]t was done through the inner company, so rather than putting an invoice together, the – the loan, I believe, was lower because of the goods that were given to Sandpiper." See Jacobs Dep. at 22. Although there is no promissory note documenting this loan, see Jacobs Dep. at 119-20, Jacobs maintains that it was "reflected on the books of both PiperGear and Sandpiper," see Second Jacobs PiperGear Decl. ¶ 2. An "Inter-company" "Transaction Report" shows the flow of money back and forth between the companies, with Sandpiper often paying bills on behalf of PiperGear. See Declaration of Richard D. Rivera (Doc. 99-1; Second Rivera Decl.) ¶ 2, Ex. A (Doc. 102). These records

_____

[3] At some point, Jacobs's ex-wife may have also shared an ownership interest in Sandpiper and PiperGear. See Jacobs Dep. at 16, 20.

appear to reflect a balance as low as $820,549.98 at the beginning of 2013, which grew to approximately $3.6 million as of August 2018.  Id.  Indeed, according to Jacobs, at the time of the asset sale PiperGear owed Sandpiper approximately $3.65 million.  See Jacobs Dep. at 116-17.

In addition to sharing the same owner, Sandpiper and PiperGear also had the same Chief Financial Officer, Morton Hollaender.  See id. at 23.  Evidence also suggests that Sandpiper and PiperGear shared several employees.  For example, Reggie Regala worked in the Sandpiper marketing department.  Id. at 71-72.  However, his email signature block includes both "Sandpiper of California, Est. 1980" and "PiperGear USA, Inc.—Berry Compliant/GSA/NAFTA, Sewn goods manufacturing and production."  See Declaration of Richard D. Rivera (Doc. 45-1; Rivera Decl.), Ex. G (Doc. 60).  Additionally, Jacobs identified Adolfo Coronel as an employee of Sandpiper in the purchasing department, see Jacobs Dep. at 100-01, and Ryan Mangahas as a Sandpiper employee in sales, id. at 101.  Yet, Regala, Coronel and Mangahas all use email addresses with a "pipergear.com" domain name.  See Rivera Decl., Ex. G at SOC000375, INNOVAPRO.002777.  Most notably, Sandpiper's exchange sales manager, Robert Van Jones, utilized a business card "[f]or several years" that identified Sandpiper on the front and PiperGear on the back.  See March 14, 2019 Deposition of Robert Van Jones (Doc. 47-1; Jones Dep.) at 86-87, Ex. 7; Jacobs Dep. at 70-74.  Significantly, the PiperGear side of the card included the statements "Made in USA," "Berry Compliant," "NAFTA," "USA," "BAA."  See Jacobs Dep. at 73, Ex. 7.  The PiperGear side of the card also included the Sandpiper logo in the top left corner.  Id.  Jacobs testified that, for a period of more than two years, he believed it was "typical" for Sandpiper business cards to utilize

a two-sided design with Sandpiper on the front and PiperGear on the back. <u>See</u> Jacobs Dep. at 73-74. Despite his use of this business card, Jones testified that he was not employed by, and did not work on behalf of, PiperGear. <u>See</u> Jones Dep. at 89.

The evidence also suggests that Sandpiper marketed itself in connection with PiperGear, promoting PiperGear as its "sister" company. On the Sandpiper website, Sandpiper described itself and included the following statements: "Featuring American Made products developed and manufactured by <u>our sister company</u>, PiperGear USA. We offer manufacturing options to meet Berry Amendment, NAFTA, GSA, or Buy American Act requirements. The growth and success of <u>our US manufacturing plant</u> is a great source of pride to us." <u>See</u> Jacobs Dep. at 147-48, Ex. 60 (printout of the Sandpiper website dated March 7, 2018) (emphasis added). The website included a PiperGear USA logo and the following description of PiperGear with a link to the PiperGear website: "Piper Gear USA is the manufacturing sister company of Sandpiper of California. PG USA provides additional options to customers providing materials and assembly to cover the full range of manufacturing requirements. Berry Amendment, Buy American Act, NAFTA, as well as overseas production." <u>Id.</u> The Frequently Asked Questions section of the website also identified PiperGear as Sandpiper's "sister company" and included similar representations regarding U.S. manufacturing. <u>See</u> Jacobs Dep. at 150-51, Ex. 62. These representations were also present in Sandpiper's catalogs, <u>see</u> Jacobs Dep. at 25-26, Ex. 3 at 52, and included on a PowerPoint slide used during a sales presentation to the military exchange buyers, <u>see</u> Jacobs Dep. at 95-97, Ex. 46; April 10, 2019 Deposition of Jeff Payne (Doc. 59-2; Payne Dep.) at 9-10; April 10, 2019 Deposition of Sean Brown (Doc. 59-1; Brown Dep.) at 82-83.

### c. Innovapro Corporation

Innovapro imports "military backpacks, gear bags, travel bags, and related goods," most of which are manufactured at a factory in China by Innovapro's affiliate Sun Fai, a Hong Kong company.  See Wu Decl. ¶¶ 3-5.  James Wu is the founder, vice-president, and a director of Innovapro.  See id. ¶ 1.  Prior to its acquisition of Sandpiper, Innovapro consisted solely of Wu and his wife, who is the president of Innovapro.  See April 4, 2019 Deposition of James Wu (Doc. 55-1; Wu Dep.) at 15-16, 96.  Wu started Innovapro in 1999 "mostly to handle business with Sandpiper," and indeed, Innovapro had no other customers besides Sandpiper.  See id. at 15-16.  At one time, around 2010, Wu was also a principal of Sun Fai, although he has "less involvement" with Sun Fai now.  See id. at 14.

Prior to the asset purchase, the goods Innovapro imported entered the United States through the port of entry in Los Angeles, California, and were then trucked to the Sandpiper warehouse in Chula Vista, California.  See Jacobs Dep. at 128-29, 158-59; Wu Decl. ¶¶ 6-7.  From there, Sandpiper shipped the goods either to its retail-customer's distribution center, or directly to the individual retail stores.  See Jacobs Dep. at 129.  At times, Sandpiper obtained goods directly from Sun Fai where "Sandpiper's customer would purchase goods from Sandpiper and pick them up directly from the factory in China." See Wu Decl. ¶ 12.[4]  Innovapro also served in the "product development process," communicating with Sandpiper, putting together a design, and then sending the design to Sun Fai "for them to produce sample, to develop the product."  See Wu Dep. at 15.

---

[4] As discussed further below, one of Sandpiper's primary customers was the Army Air Force Exchange System (AAFES).  AAFES operated a "direct import" program where it would obtain Sandpiper's products directly from the manufacturer in China.

According to Wu, all of the goods imported by Innovapro or produced by Sun Fai bear "MADE IN CHINA" labels sewn into the fabric of the product.   See Wu Decl. ¶ 27.

## 2.  Sandpiper Operations

The majority of Sandpiper's sales were made in bulk to vendors such as the Army Air Force Exchange System (AAFES), as well as the Marines Corps Exchange (MCX) and the Navy Exchange (NEXCOM).   See Jacobs Decl. ¶¶ 13, 18; Jacobs Dep. at 154. Significantly, "[a]ll military exchanges practice central buying.   So all buying decisions are made at [headquarters], and then planners and allocators and replenishers determine stock levels at each individual location, and the product is distributed to those locations appropriately from the distribution centers."   See Brown Dep. at 25.   Thus, sales of Sandpiper products to military exchanges occurred at two-levels.   See Deposition of Robert Van Jones (Doc. 47-1; Jones Dep.) at 10-11; see also Declaration of Zach Mitchell (Doc. 45-3; Mitchell Decl.) ¶¶ 4-6 (generally describing the system-wide and store-level sales that occur within the Exchange Systems).   At the first level, Sandpiper sold its product to the system-wide exchange buyers who were located at headquarters in Dallas (for AAFES), and Virginia Beach (for MCX and NEXCOM).   See Brown Dep. at 24-25; Jones Dep. at 9-10; see also Mitchell Decl. ¶ 5 ("First, system-wide AAFES buyers at headquarters will purchase product to stock in the stores, system-wide.").   These system-wide buyers chose the products and set the planogram (POG), that is, the "model that goes into the stores."   See Jones Dep. at 10.

The second-level occurs at the individual stores where Sandpiper also played an active role.   Id. at 10-11; see also Jacobs Dep. at 38-39, 42-46, Ex. 6: SOC Triangle for Success, In-Store Plan.   Within the AAFES system, Sandpiper could monitor the amount

of product at an individual store location, and if a store was low, ensure that additional product was delivered to the store to satisfy the anticipated need.  <u>See</u> Jacobs Dep. at 54-55.  In addition, "with the stores, [a sales representative] can go in and . . . create promotions, one-time buys on occasion, and . . . for a promotion, [the representative] can get them to increase their inventory level.  That's instrumental."  <u>See</u> Jones Dep. at 10-11; <u>see also</u> Mitchell Decl. ¶ 5 ("[O]nce a product has been added system-wide, AAFES individual store managers can request to buy additional products as needed, sometimes as a result of sales that sales representatives make to the AAFES local store managers on a store by store basis at the individual store level.").  According to Sandpiper's exchange sales manager, Robert Van Jones:

> What the stores were used to doing—and I think it's commonplace with most manufacturers—they would—for a given promotion, they would say, 'All right.  We're going to have a 20-percent-off sale on Sandpiper for this weekend.'  What would happen is, we would give a discount of 10 percent.  The store would match it with 10 percent.

<u>See</u> Jones Dep. at 23.  Indeed, Jones testified that "[a] lot of times" store managers would contact him directly to negotiate Sandpiper's assistance with a promotion.  <u>Id.</u> Sandpiper also worked with individual stores to add new fixtures to display Sandpiper products.  <u>See</u> Jones Dep. at 20-21; Jacobs Dep. at 39-40, 45-46 (explaining that after receiving approval from the military buyers for the display, "you have to go into the stores individually, speak to the manager, the GM, . . . and sell the idea.  The idea was to bring the display in, to give us extra support as far as being able to show more of our product inside of the store.").  Although such fixtures had to be approved at the system-wide level, the fixtures were then shipped from Sandpiper directly to individual stores and then

assembled, typically by a Sandpiper contractor who serviced the store.   <u>See</u> Jones Dep. at 20-21; Jacobs Dep. at 45-46.

Notably, Jacobs believed Sandpiper's involvement at the store-level was so important to its business that he developed the "SOC Triangle for Success, In-Store Plan" in order "to optimize our sales in just about all the different—all of the stores that we sold to, whether it was through AAFES, MCX, which is the Marines, NEXCOM, the Navy, to cover all this data here to promote our product."   <u>See</u> Jacobs Dep. at 36-37, Ex. 6.   The "Triangle" consisted of AAFES[,] management in San Diego[,] and in-field management working together in a relationship.   Three-legged stool."   <u>See</u> Jones Dep. at 75.   "In-Store" referred to Sandpiper's physical presence in the stores for implementation of the plan.   <u>See</u> Jacobs Dep. at 38-39.   The plan outlined objectives under several headings, including "Store management communications," "product promotion support," "store level merchandising support," and "competitive disruption at all stores, floor displays, POS," among others.   <u>See</u> Notice (Doc. 47), Ex. 6.   The "competitive disruption" heading included a sub-heading titled "capture the hearts and minds of AAFES Managers," which is followed by several bullet points, one of which references "product sales monitoring and order suggestions."   <u>Id.</u>

In 2014, Sandpiper hired Paragon Brokerage Inc. to act as a broker between Sandpiper, the supplier, and the military exchange buyers.   <u>See</u> Payne Dep. at 6-7; Brown Dep. at 16-17, 32-33, Ex. 37; Jacobs Dep. at 91.[5]   Paragon is a military brokerage company founded by Sean Brown in 1994 with over 80 major clients.   <u>See</u> Brown Dep. at 9-10, 22, 50.   Paragon operates as an independent contractor and is "paid commission

_____

[5] Prior to its contract with Paragon, Sandpiper had contracted with other companies to fill this same role, including one company based out of Florida.   <u>See</u> Jacobs Dep. at 11, 17-19, 52, 139.

on sales that [it] generate[s] at headquarters, military exchange headquarters." See id. at 16, 22. Sandpiper and Paragon entered into a "Supplier Authorization Agreement" in 2014, whereby Paragon agreed to serve as Sandpiper's "exclusive worldwide sales representative" with the AAFES. See id. at 32-33, Ex. 37. This relationship was later expanded to include MCX and NEXCOM as well. See Jacobs Dep. at 87-88; Brown Dep. at 33-34. Pursuant to this agreement, Paragon made presentations at military headquarters regarding "new items for their consideration for stock assortments." See Brown Dep. at 25. Notably, a Sandpiper sales manager, Dino Riggott, participated in all of these presentations. Id. at 23. In addition, Sandpiper "essentially always" provided Paragon with sales materials "whenever [it] would go into a headquarters meeting or presentation with a buyer." See Payne Dep. at 9-10, Ex. 46. Such materials included a PowerPoint presentation with a slide that depicted a "Made in USA" decal and the following statements: "Featuring American Made products developed and manufactured by our sister company, PiperGear USA. We offer manufacturing options to meet Berry Amendment, NAFTA, GSA or Buy American Act requirements. The growth and success of our US manufacturing plant is a great source of pride to us." See id., Ex. 46.

Paragon also provides services to its clients, including Sandpiper, at the individual store level. See Brown Dep. at 23-24, Ex. 37. Specifically, Paragon operates "a worldwide sales force of independent contractors" whose responsibilities include:

> Stocking the shelves, setting new planograms. So as the buyer changes out the assortments, we go in and make those changes, make sure the products are priced correctly, the pegs—you know, the peg that you see at the end—where something is hanging, make sure that's been adjusted. We do cooking demos, food demos. We facili[tate] getting the manufacturer on base. A lot of the manufacturers like to visit bases to check it out. Our reps do that. As I think I mentioned earlier, return defective stock and—primarily they're merchandisers. Probably 90

percent of their efforts are merchandising, if we include doing demonstrations.

See id. at 23-24.  These merchandisers are "a vast network of retired military people and dependents of military people."  Id. at 52.  According to Brown, these individuals are independent contractors who are paid by the hour and "might work for ten companies like [Paragon]."  Id. at 52-53, 104, 107.  Because most planograms contain products for several different companies, Paragon pays the individual to put out its client's products on the planogram, "then the next company pays for them to put their products on, and then the next company pays them to put their products on."  Id. at 53-54.  Significantly, Paragon never provides these merchandisers with catalogs or sales literature "because selling directly to stores is not permitted."  Id. at 55.  According to Brown, the merchandisers are "not selling," rather "[t]hey're merchandisers . . . . They're just there to make sure our products are on the shelves."  Id. at 56.

Notably, direct communication between Paragon merchandisers and Sandpiper was strictly forbidden.  Id. at 110, 126-27.  According to Brown, Paragon merchandisers were "under strict instructions" not to take directives from Sandpiper because ultimately, the time sheets go to Paragon.  Id. at 127.  Brown explains that Paragon "can't have our manufacturers telling [the merchandisers] what to do or asking them to do a project and then we get the time sheet for it."  Id.  Indeed, Paragon goes so far as to "hide" the contact information for the merchandisers from the suppliers so that suppliers will not be able to issue directives directly to merchandisers.  Id. at 128.  Although the SOC Triangle for Success In-Store Plan was "consistently pushed by the executives at [Sandpiper]," Brown thought the Triangle was "ridiculous," and had "no relevance to anything" Paragon did.  Id.

at 93-94.   According to Brown, Paragon was "not directed to do anything" regarding the Triangle, never used the Triangle in presentations, and ignored it   Id. at 94.

Significantly, in addition to the Paragon merchandisers, Sandpiper engaged its own network of store-level representatives.   Indeed, Jacobs strongly believed in developing good relationships and goodwill at the store level.   See Jones Dep. at 10.   In 2010, Sandpiper hired Jones as a salaried employee to work "very closely with the individual bases."   Id. at 8-9; Jacobs Dep. at 41-42, 181.   At the time he was hired, Jones lived in Georgia and held the title of "Regional Sales Manager."   See Jones Dep. at 25.   Jones traveled from base to base, "selling them products, selling them displays, working with the managers, creating trust and relationships and so on."   Id. at 8-9.   Despite the "regional" title, Jones traveled beyond just the southeast, including trips to New England and Oklahoma.   Id. at 25.   In approximately 2012, his title changed to "Exchange Stores Sales Manager" and remained the same throughout the remainder of his employment with Sandpiper.   Id. at 43; Jacobs Dep. at 70 (identifying Jones' title as "Exchange Sales Manager").   In 2015, for personal reasons, Jones moved to Navarre, Florida, where he is currently living.   See Jones Dep. at 90-91.

Beginning in 2015, because Paragon's "strategy in the field was not exactly what [Jacobs] wanted," Jacobs directed Jones to "hire on as many people as [he] could in all stores that would work strictly—merchandisers that would work strictly for Sandpiper.   We could control them; we could make sure they're in there."   Id. at 16, 26-27; see also Jacobs Dep. at 52-53.   Jones explained that Sandpiper "wanted that extra layer of support and . . . [was] coming with new products . . . and new fixtures, new marketing tools—we wanted to make sure those were in place and represented as well as possible."   See Jones Dep.

at 16.  According to Jones, Jacobs' plan "was to try to get as many merchandisers in as many stores as possible."  Id. at 26.  As a result, Sandpiper went from "just a handful of representatives to about 60 in AAFES," "[a]bout eight to ten" in the Navy, and a few in the Marines.  Id. at 27.  Jones was responsible for training and supervising these Sandpiper merchandisers.  See Jones Dep. at 18.  Sandpiper developed checklists for the merchandisers to complete and required the merchandisers to submit pictures of the completed planograms to Jones.  Id. at 18-19.  At his deposition, Jones explained that "[t]here's a basic inventory checklist that has every item in the [planogram] listed, and [the merchandisers] have to do on-hands and on-orders . . . and then turn that in."  Id. at 36. At smaller stores, merchandisers provided this information once a month, at larger stores, twice a month.  Id. at 36.  According to Jones, this information was of "utmost importance" because it provided him with insight as to what was occurring at the store-level.  Id.  As such, Jones told the merchandisers that they were Sandpiper's "'eyes and ears in the store.'"  Id.

Sandpiper's merchandisers were paid by the hour and submitted their timesheets to Jones for approval on a monthly basis.  Id. at 31.  Jones sent the information to Sandpiper in California, and Sandpiper then mailed paychecks directly to the merchandisers at their homes, including to those merchandisers who lived in Florida.  Id.; Jacobs Dep. at 60-61, 86.  Similar to the Paragon merchandisers, Sandpiper merchandisers were independent contractors who worked for other companies as well, although Sandpiper typically would not hire a merchandiser if he or she worked for a competing line.  See Jones Dep. at 12-14; Jacobs Dep. at 168-69.  Unlike Paragon, Sandpiper merchandisers were supposed to try and persuade the store manager to buy

more product, where warranted.  See Jones Dep. at 48.   Thus, in addition to ensuring that Sandpiper fixtures were stocked and clean, with correct signage, Jones trained merchandisers to "have relationships with the managers; because, the more you can get out of the managers, the better it is for the company."  Id. at 18-19.   Notably, Sandpiper expected its merchandisers to have "competent product knowledge," which according to Jacobs, "probably" included information regarding the country of origin of the particular products.  See Jacobs Dep. at 56-57.   However, merchandisers were not provided with Sandpiper's product catalog due to the cost and because "they really didn't need it."  See Jones Dep. at 61.

Florida is not a major market for Sandpiper brand products.  Id. at 14-15, 34, 93; see also Brown Dep. at 105, 130-31.[6]   In 2016, Florida accounted for only 1.39% of Sandpiper's total sales.  See Wu Decl. ¶ 43.   In 2018, up to the date of the asset sale, only 2.2% of Sandpiper's total sales came from Florida.  See id.   According to Brown, between March 19, 2014, and March 20, 2019, Sandpiper sold, in total, approximately $1.2 million in retail dollars-worth of products at AAFES and NEXCOM exchange stores in Florida.  See Brown Dep. at 112-13, Ex. 40.   In comparison, the annual military business worldwide of Sandpiper brand products is approximately $13.5 million.  Id. at 113; see also Wu Decl. ¶ 43.   Brown further testified that Paragon does not have a "significant rep presence" in Florida because "Florida doesn't have a lot of bases."  See Brown Dep. at 51, Ex. 39.   For example, over the last five years, Paragon has paid $62,256.26 to merchandisers servicing Sandpiper products, and only $3,010 of that went to

---

[6] Although Sandpiper is no longer in operation, Innovapro has continued to sell Sandpiper brand products.   As such, some of the statistics cited here, as provided in Brown's testimony, span both before and after the asset sale.   Nonetheless, the Court relies on these statistics to the extent they are helpful in understanding the extent of Sandpiper's activities in Florida prior to the asset sale.

merchandisers working in Florida. <u>See</u> Brown Dep. at 108, Ex. 38. This amounts to only 251 hours of service on behalf of Sandpiper products in Florida by Paragon merchandisers over a five-year period. <u>Id.</u> at 124. The vast majority of Sandpiper's internal merchandisers served exchanges and bases outside the state of Florida. <u>See</u> Jacobs Dep. at 169-70. Sandpiper records reflect that it employed only three merchandisers with Florida addresses to work on its behalf at military exchange stores in Florida. <u>See</u> Notice (Doc. 47), Ex. 15; Jones Dep. at 34, 37-38; Notice (Doc. 73), Ex. E (Doc. 78). And, Jones, the salaried exchange sales manager has lived and worked out of a home office in Navarre, Florida since December 2015. <u>See</u> Jones Dep. at 43, 52, 90-91. As part of his job responsibilities, Jones called on various military bases in Florida, including Eglin, Pensacola Navy, Hurlburt Field and Tyndall Air Force Base, <u>see</u> Jones Dep. at 15, 33, nevertheless, the majority of Jones' work was directed at areas outside Florida, <u>see</u> Jacobs Dep. at 172.

Although most of Sandpiper's business involved bulk sales to retailers, Sandpiper also operated a website which included an option for individual sales. <u>See</u> Jacobs Sandpiper Decl. ¶ 14. Individual internet sales overall accounted for less than 1% of Sandpiper's annual business, and only a small percentage of those internet sales were made either from Florida or shipped to Florida. <u>Id.</u> ¶¶ 15-16. From January 1, 2018, until August 31, 2018, only six individual sales through the website were related to Florida, amounting to no more than 0.007% of Sandpiper's sales during that time frame. <u>Id.</u> ¶ 16. In 2017, internet sales to Florida represented 0.01% of Sandpiper's total sales, and in 2016 represented 0.02% of total sales. <u>Id.</u>

### 3. FTC Action

Jacobs first became aware that the FTC was investigating his companies when he received a letter from the FTC on April 5, 2018.  <u>See</u> Jacobs Dep. at 104.  In the letter, the FTC informed Jacobs that it had investigated Sandpiper and PiperGear and intended to pursue a formal enforcement action against Sandpiper and PiperGear for violating 15 U.S.C. § 45 "in connection with the advertising and sale of certain backpacks and tactical gear as made in America or the United States, even though they are wholly imported or contain significant imported content."  <u>See</u> Jacobs Dep. at 103-04, Ex. 20 at SOC000235. The FTC "served a proposed complaint on [Sandpiper] and PiperGear charging them with false advertising in connection with their claims that [Sandpiper] and PiperGear manufactured their products in the United States."  <u>See</u> Complaint, Ex. A: Proposed FTC Complaint.  The Proposed FTC Complaint specifically referenced statements made on the Sandpiper and PiperGear websites, as well as posts which Sandpiper made on Instagram.  <u>See</u> Proposed FTC Complaint ¶ 6.  The FTC also referenced "certain wallets imported from Mexico as finished goods," in which Sandpiper and PiperGear "hid truthful country-of-origin information on the back of tags, and inserted cards that prominently displayed false U.S.-origin claims."  <u>Id.</u> ¶ 7.  On May 1, 2018, Jacobs, on behalf of Sandpiper and PiperGear, executed a Consent Order with the FTC.  <u>See</u> Jacobs Dep. at 110-11, Ex. 50.

In late May of 2018, Sandpiper began a recall of the objectionable wallets from AAFES locations.  <u>See</u> Brown Dep. at 63, Exs. 20, 41; <u>see also</u> Payne Dep. at 17-18, <u>see id.</u> at 12, Ex. 20.  Significantly, some of those wallets were sold at military exchange bases in Florida.  <u>See</u> Brown Dep. at 121-22, Ex. 20.  Despite the recall, as of February 19,

2019, some of the improperly labeled wallets remained in exchange stores.  <u>See</u> Declaration of Teresa Carlson (Doc. 45-5) ¶ 7 (asserting that on the week of February 19, 2019, she found Sandpiper wallets with the misleading label at the Lackland Air Force Base Exchange store and the Fort Lee Exchange store).   Significantly, in December 2016, Advantus had attempted to sell "a wallet program to AAFES for six SKUs that AAFES was planning to carry in various exchanges throughout the country, including the AAFES locations at MacDill and Eglin Air Force bases."  <u>See</u> Mitchell Decl. ¶ 11.   Advantus "lost that proposal to Sandpiper and [was] informed that it was because AAFES went with the Sandpiper products because AAFES wanted to have domestic production for those products."  <u>Id.</u>

### 4. Innovapro's Takeover

As stated above, Sandpiper purchased goods from Innovapro, which imported them from the manufacturer, Sun Fai, in China.   Sandpiper also purchased goods directly from Sun Fai.   According to Wu, "[b]etween January 2015 and mid-2018, Sandpiper purchased over $25 million in goods from Innovapro and Sun Fai on credit accounts."  <u>See</u> Wu Decl. ¶ 14.   However, "Sandpiper was unable to pay for all the goods it purchased and by the early spring of 2018, the combined debt owed by Sandpiper to Innovapro and Sun Fai exceeded $10 million."  <u>Id.</u> ¶ 15.   Wu asserts that "Sun Fai assigned its portion of the debt to Innovapro for collection."  <u>Id.</u> ¶ 16.   "After being threatened with collection proceedings, Sandpiper attempted to negotiate a workout whereby the debt would be reduced and paid off over time."  <u>Id.</u> ¶ 17; <u>see also</u> Innovapro Reply, Ex. C (Doc. 96) (email chain between counsel for Sandpiper and Innovapro's counsel negotiating a plan to address Sandpiper's debt including a payment plan, granting Innovapro a security

interest, and ultimately proposing an asset sale).   Although these negotiations began around the same time that Sandpiper learned of the FTC investigation, Jacobs maintains that the FTC action was not a precipitating cause of the negotiations leading to the asset sale.   <u>See</u> Jacobs Dep. at 107.   Rather, in April of 2018, Sandpiper attempted to pay Innovapro "a million dollars in postdated checks," two of which "were good, so bought some time there," but then "the subsequent checks bounced."   <u>Id.</u> at 107-08.   According to Jacobs, "that's what probably precipitated the negotiations as far as, you know, [']Dave [Jacobs], this isn't working.   Let's try to work something else out.[']"   <u>Id.</u> at 108.   Soon after, Sandpiper granted bank access to Wu so he could "monitor and see that we're not going to bounce anymore checks on you going forward, number one.   And number two is if you're going to continue to give us any kind of credit, it's okay that you're at [sic] looking in on our business."   <u>Id.</u> at 109.   This occurred at approximately the same time that Sandpiper and PiperGear signed the Proposed Consent Order with the FTC.   <u>Id.</u> at 111.

As negotiations continued, "Sandpiper agreed to secure the debt in exchange for a temporary forbearance on collection proceedings.   Innovapro filed a UCC-1 financing statement in July of 2018 against Sandpiper in California to perfect its security interest." <u>See</u> Wu Decl. ¶ 18; <u>see also</u> Jacobs Dep. at 122-24, Ex. 52: Extension Agreement; Innovapro Reply, Ex. C at INNOVAPRO.000448-452.   Ultimately, "Innovapro and Sandpiper agreed to terms for resolution of the debt that took the form of a forgiveness of debt in return for a transfer of assets from Sandpiper to Innovapro."   <u>See</u> Wu Decl. ¶ 20. Indeed, on July 6, 2018, Innovapro and Sandpiper entered an "Extension Agreement" which memorialized the existence of a "preliminary agreement" as follows: "The first step involves the acknowledgement of debt by [Sandpiper], the granting of a security interest

by [Sandpiper], the timely delivery of product to [Sandpiper], and the oversight of the operation of [Sandpiper's] business by [James Wu] until such time as the assets of [Sandpiper] are sold to [Innovapro]." See Jacobs Dep. at 122-23, Ex. 52: Extension Agreement at 1. Pursuant to the Extension Agreement, Innovapro agreed to "allow [Sandpiper] to maintain access to goods to be sold by [Sandpiper]," in consideration for Sandpiper "granting a security interest as set forth in this agreement . . . ." See Extension Agreement at 1. The Extension Agreement further provided that "[o]n the completion of the Asset Sale, all indebtedness secured by this agreement will expire, and Creditor's security interest in the Collateral, as set forth in this Agreement, will terminate." See id. at 7.

On August 31, 2018, Innovapro and Sandpiper entered into a written Asset Purchase Agreement. See Wu Decl. ¶ 21, Ex. A: Asset Purchase Agreement (APA). At the time of the asset sale, Sandpiper was insolvent. See Wu Dep. at 51-52. Pursuant to the APA, Innovapro acquired Sandpiper's outstanding inventory, customer contacts, trademarks, trade names, domain name, website and social media sites. See Wu Decl. ¶ 23. Innovapro did not acquire "any aspect of the Piper Gear USA business or assets, nor did it acquire a line of wallets that was the subject of a pending [FTC] investigation based on false origin claims." Id. ¶ 26. Innovapro also declined to purchase outstanding loans that both Jacobs and PiperGear owed to Sandpiper, and did not require Jacobs or PiperGear to pay this money back. See APA ¶ 1.B; Jacobs Dep. at 117; Wu Dep. at 53-54. According to Jacobs, beginning in 2006 or 2007, and extending possibly through 2018, he borrowed close to $1.1 million from Sandpiper. See Jacobs Dep. at 115-16. Jacobs testified at his deposition that PiperGear owed $3.65 million to Sandpiper. Id. at

116-17.   According to Jacobs, Sandpiper loaned money to PiperGear at the time it was incorporated so that PiperGear "could begin doing business."   <u>See</u> Second Jacobs PiperGear Decl. ¶ 2.   Jacobs maintains that the loan was "partially repaid over time" and "ultimately the remaining balance on August 31, 2018, was forgiven."   <u>See id.</u> ¶ 2; Jacobs Dep. at 117.   Neither Jacobs nor PiperGear ever signed a promissory note for these loans.   <u>See</u> Jacobs Dep. at 120.   Moreover, as previously noted, these loans are not reflected in Sandpiper's accounts receivable ledger, <u>see</u> Jacobs Dep. at 119-20, Ex. 29, and according to Wu, he never saw any documentation for these loans.   <u>See</u> Wu Dep. at 85-86.   Nevertheless, Jacobs maintains that the CFO for PiperGear and Sandpiper kept track of the loans and they were accounted for in the records of those companies.   <u>See</u> Jacobs Dep. at 176-77; Second Jacobs PiperGear Decl. ¶ 2.

With limited exceptions not relevant here and expressly outlined in the APA, "Innovapro did not assume any liabilities of Sandpiper . . . ."   <u>See</u> Wu Decl. ¶ 24; <u>see also</u> APA ¶ 2.   As part of the APA, Innovapro entered into a two-year consulting agreement and a five-year-non-compete agreement with David Jacobs.   <u>See</u> Wu Decl. ¶ 29; APA ¶¶ 8-9, Sched. 8-9.   Although Jacobs has received payment under the consulting agreement, Wu has not asked him to provide any services.   <u>See</u> Wu Dep. at 59; Jacobs Dep. at 33. In conjunction with the APA, Sandpiper agreed to amend its articles of incorporation to change its name to DBJ Enterprises.   <u>See</u> Wu Decl. ¶ 30; APA ¶ 12.   On September 4, 2018, Sandpiper notified the FTC of the asset sale to Innovapro and the agreement to change its name to DBJ Enterprises.   <u>See</u> Jacobs Dep. at 160, Ex. 55.   The certificate of amendment making this change, signed by Jacobs and dated August 31, 2018, was filed

with the California Secretary of State on October 5, 2018.  See Jacobs Dep. at 125-26, Ex. 53.

Since acquiring Sandpiper's assets, Innovapro has continued Sandpiper's business of supplying Sandpiper-branded products to the military exchanges.  See Wu Decl. ¶ 36. Prior to the take-over, Innovapro entered a contract with Paragon so that Paragon would seamlessly continue its services as the sales representative for the Sandpiper brand.  See Wu Dep. at 47-48.  Jeff Payne, Paragon's national account manager, testified that Paragon's responsibilities on behalf of the Sandpiper brand have not changed since Innovapro's take-over.  See Payne Dep. at 6-7; Brown Dep. at 95.  With Paragon's assistance, Innovapro "went through all the steps necessary to be set up as a new— essentially a brand new vendor in the AAFES system."  See Payne Dep. at 11, 22-23. After the asset sale, Innovapro met with AAFES to "announc[e] the new ownership and introduc[e] Michael Bennett as the new direct representative at Sandpiper."  Id. at 10-11. However, at the time of Payne's April 10, 2019 deposition, Paragon had not "had any new product presentations," and Innovapro had not provided Paragon with "any marketing materials" or a new product catalog.  Id. at 23.  According to Payne, the Sandpiper brand product line sold to AAFES has remained the same, with the exception of the wallet series that was recalled in May 2018.  Id. at 8.[7]

---

[7]  In his Declaration, Wu asserts that Innovapro did not acquire "a line of wallets that was the subject of a pending [FTC] investigation based on false origin claims."  See Wu Decl. ¶ 26; APA ¶ 1.B.  However, a document titled Sales Orders Invoiced Summary, appears to indicate that Innovapro continued to invoice NEXCOM and MCX, as well as other non-military exchange retailers, for the shipment of these wallet products after the August 31, 2018 asset purchase.  See Wu Dep. at 92-93, Ex. 34.  And, in November of 2018, Innovapro was involved in a recall of wallet products from NEXCOM and MCX.  See Notice (Doc. 73), Ex. H.

As part of the take-over, Innovapro terminated all Sandpiper employees.  See Wu Dep. at 31-32.  Innovapro then re-hired "7 or 8" of those employees, including Jones.  See Wu Dep. at 30-32; Jones Dep. at 92.  Jones' first responsibility on behalf of Innovapro was to terminate all of Sandpiper's internal merchandisers, with the exception of a "handful" serving the major stores, none of which are in Florida.  See Jones Dep. at 92-93.  The work that was previously performed by Sandpiper's merchandisers is now handled by Paragon's field force.  Id. at 107.  According to Jones, Innovapro made a business decision to terminate these internal merchandisers and instead let Paragon's merchandisers take over because "they're getting a commission on everything anyway."  Id. at 94-95.  According to Jones, two of the Florida merchandisers had previously left due to personal reasons, and Jones terminated the "one in Jacksonville that did Mayport and JAX Navy and Camp Lejeune" on October 1, 2018.  Id. at 94.[8]  Jones exercises no managerial authority over the Paragon merchandisers, as "Paragon handles that themselves."  Id. at 95.  Instead, Jones' job responsibilities for Innovapro consist primarily of managing the activities of the few remaining Sandpiper merchandisers at the larger exchange stores, and maintaining "[r]elationships with managers and the GMs at store level, which is kind of the next step up from the merchandisers . . . ."  Id. at 99; see also Wu Dep. at 34 ("A. Mr. Van Jones's main job is for service.  Not much of sales.  Q. The servicing of the stores and the customers? A. The service, yeah.").  Although Jones agreed that his job is to maintain relationships with managers both inside and outside of Florida, he reiterated—"But, again, Paragon is taking over all of the representation in

---

[8] Jones' testimony is contradicted by records which indicate that of the three Sandpiper merchandisers in Florida, one did leave in the spring of 2018 for personal reasons, but the other two were still working on behalf of Sandpiper as of September 2018.  See Notice (Doc. 73), Ex. A, E; see also Notice (Doc. 47), Ex. 15.

Florida.   I really am not going to be involved in that."   <u>See</u> Jones Dep. at 99-100.   Since the take-over, Jones has, on two occasions, visited the exchange store at the Pensacola Naval Air Station in Florida, in his capacity as an Innovapro employee.   <u>Id.</u> at 96.   While there, he briefly met with the manager of the exchange store who was requesting additional fixtures for the store.   <u>Id.</u>   Other exchanges in Florida are too small for Jones to call on, such that the majority of his work is done over the phone and e-mail with people located outside the state of Florida.   <u>Id.</u> at 100-01.

Florida remains a minor market for Sandpiper-brand products after the take-over. <u>See</u> Wu Decl. ¶¶ 40-43.   Nevertheless, Innovapro does ship products directly to Florida. <u>See</u> Wu Dep. at 79, Ex. 27 (identifying Exhibit 27 as "[o]ne of our printouts for shipping location when in state of Florida" with item numbers identifying Innovapro products). According to Wu, the primary customers for Innovapro's Sandpiper products are the military exchanges, AAFES and NEXCOM, and Innovapro's business dealings with these customers occur at their headquarters in Dallas (AAFES) and Virginia (NEXCOM).   <u>Id.</u> ¶¶ 36-37.   Wu maintains that "Innovapro's military exchange customers arrange to pick up prepackaged product at Innovapro's warehouse in California, and then ship the product to their own distribution centers for further processing."   <u>Id.</u> ¶ 39.   As such, according to Wu, "Innovapro does not deal directly with the Florida stores or deliver product directly to the Florida stores."   <u>Id.</u> ¶ 38.   Sandpiper products sold in military exchange stores located in Florida "account for fewer than 2% of total Sandpiper sales nationwide."   <u>Id.</u> ¶ 40. Sandpiper products are also sold in Florida through "small, independent retailers," and online through the Amazon.com marketplace, as well as the Sandpiper website.   <u>See</u> <u>id.</u> ¶ 41.   These sales amount to less than 0.5% of Innovapro's total Sandpiper sales.   <u>Id.</u>

According to Wu, "[t]here have been only three online sales delivered to Florida since Innovapro took over the www.sandpiperca.com website."  Id. ¶ 42.  Since the take-over, Florida sales of Sandpiper products through all channels make up 2.15% of Innovapro's total Sandpiper sales.  Id. ¶ 43.  However, Florida's share of Sandpiper's total sales, although small, has gradually been increasing since 2016.  Id.

## III. Personal Jurisdiction

### A. Applicable Law

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements."  See Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008).  "If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant."  Id.  Thus, to determine whether personal jurisdiction exists over Defendants, the Court must engage in a two-part inquiry.  See Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004).  First, the Court must determine "whether the exercise of jurisdiction is appropriate under [Florida]'s long-arm statute."  Id. (citing Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir. 1996)).  Second, the Court must consider whether exercising personal jurisdiction over Defendants is consistent with "the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'"  Id. (quoting Sculptchair, Inc., 94 F.3d at 626).  "Only if both prongs of the analysis are satisfied may a federal or state court exercise personal

jurisdiction over a nonresident defendant." Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996) (internal quotations omitted).

### 1. Florida's Long-Arm Statute[9]

The reach of Florida's long-arm statute is a question of Florida law. See Meier, 288 F.3d at 1271. Thus, this Court must construe the long-arm statute as would the Florida Supreme Court, and, absent some indication that the Florida Supreme Court would hold otherwise, this Court is bound to adhere to decisions of Florida's intermediate courts. See id. Florida's long-arm statute provides in pertinent part:

> (1)(a) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> 2. Committing a tortious act within this state.

Fla. Stat. § 48.193. The Court notes that while the term "'arising from'" as used in Florida Statutes section 48.193(1)(a) "does not mean proximately caused by, it does require direct affiliation, nexus, or substantial connection to exist between the basis for the plaintiff['s] cause of action and the defendant['s action falling under the long-arm statute]." Nw

---

[9] The Court notes that Florida's long-arm statute — Florida Statutes section 48.193 — confers two types of jurisdiction. See NW Aircraft Capital Corp. v. Stewart, 842 So. 2d 190, 193-95 (Fla. Dist. Ct. App. 2003). First, section 48.193(1) lists enumerated acts which will confer specific personal jurisdiction over a defendant for suits arising from those acts. See Fla. Stat. § 48.193(1). Next, section 48.193(2) "provides that Florida courts may exercise general personal jurisdiction" if the defendant engages in "substantial and not isolated activity in Florida[,]" whether or not the claims asserted actually involve the defendant's activities in Florida. See Carmouche v. Tamborlee Mgmt., Inc., 789 F.3d 1201, 1203-04 (11th Cir. 2015) (emphasis in original). In the Complaint, Advantus appeared to invoke both types of personal jurisdiction. See Complaint ¶ 9. However, in its Response, Advantus relies solely on specific personal jurisdiction under section 48.193(1)(a)(1.) and (2.), and thus, the Court will limit its analysis to those subsections.

Aircraft Capital Corp., 842 So. 2d at 194; see also Glovegold Shipping, Ltd. v. Sveriges Angfartygs Assurans Forening, 791 So. 2d 4, 10 (Fla. 1st Dist. Ct. App. 2000).

To establish that a defendant is "carrying on a business" in this state for purposes of the long-arm statute, "'the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit.'" See Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1167 (11th Cir. 2005) (quoting Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000)). "That requirement can be satisfied either by (1) 'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit or' (2) 'doing a single act for such purpose with the intention of thereby initiating a series of such acts.'" See RMS Titanic, Inc. v. Kingsmen Creatives, Ltd., 579 F. App'x 779, 783-84 (11th Cir. 2014) (quoting Wm. E. Strasser Constr. Corp. v. Linn, 97 So. 2d 458, 460 (Fla. 1957)). The Eleventh Circuit has listed the following relevant, although not dispositive, factors for courts to consider in this analysis: "the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." See Horizon Aggressive Growth, L.P., 421 F.3d at 1167 (internal citations omitted).

Florida Statutes section 48.193(1)(a)(2.) authorizes the exercise of jurisdiction over a non-resident defendant who commits a tortious act within Florida. See Fla. Stat. § 48.193(1)(a)(2.). However, "a defendant's physical presence is not necessary to commit a tortious act in Florida." See Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002). Rather, a nonresident defendant can commit a tortious act in Florida under section 48.193(1)(a)(2.) by way of telephonic, electronic, or written communications into Florida,

so long as the tort alleged arises from such communications.  See Internet Solutions Corp. v. Marshall, 39 So. 3d 1201, 1208 (Fla. 2010); Wendt, 822 So. 2d at 1253.  In addition, "[a]ccording to precedent binding [in the Eleventh Circuit,] subsection [(1)(a)(2.)] extends long-arm jurisdiction over defendants who commit a tort that results in injury in Florida."  Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1219 (11th Cir. 1999); Licciardello, 544 F.3d at 1283; Estate of Scutieri v. Chambers, 386 F. App'x 951, 955 (11th Cir. 2010).  Notably, "[t]he Florida Supreme Court has provided only limited guidance on the question of when a tort committed out of state but causing injury in Florida is sufficient to give Florida courts personal jurisdiction over the tortfeasor," and Florida's intermediate appellate courts are divided on the issue.  See Estate of Scutieri, 386 F. App'x at 955 (citing Wendt, 822 So. 2d at 1253 n.2); see also Internet Solutions, 39 So. 3d at 1206 n.6 ("We do not decide the broader issue of whether injury alone satisfies the requirement of section [48.193(1)(a)(2.)].").  Indeed, the Court questions whether section 48.193(1)(a)(2.) is properly understood "to encompass all tortious acts which were complete outside Florida but ultimately have consequences here only because a Florida resident suffers damages."  See Korman v. Kent, 821 So. 2d 408, 411 (Fla. 4th DCA 2002) (emphasis added); Arch Aluminum & Glass Co., Inc. v. Haney, 964 So. 2d 228, 232-35 (Fla. 4th DCA 2007); see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1168 & n.7 (11th Cir. 2005) (citing Korman, 821 So. 2d at 411, for the proposition that "Wendt cannot be construed to grant jurisdiction under [section 48.193(1)(a)(2.)] in every situation where a tort was completed out-of-state but caused injury in Florida").  Nevertheless, "[u]nless and until the Florida Supreme Court rejects [the Eleventh Circuit's] construction of the long-arm statute" this Court is "bound to follow [the]

'firmly established precedent, which interprets subsection [(1)(a)(2.)] to apply to defendants committing tortious acts outside the state that cause injury in Florida.'" See Estate of Scutieri, 386 F. App'x at 955 (quoting Posner, 178 F.3d at 1217).[10]

## 2. Constitutional Due Process

In addition to the issue of long-arm jurisdiction, the Court must consider whether the exercise of personal jurisdiction over Defendants in this case "would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Sculptchair, Inc., 94 F.3d at 626). A determination of whether exercising personal jurisdiction comports with the requirements of due process also requires a two-part inquiry. See Sculptchair, Inc., 94 F.3d at 630-31 (11th Cir. 1996). First the Court looks to see whether Defendants have sufficient "minimum contacts" with the state of Florida. See id. at 630. In Licciardello, the Eleventh Circuit explained that:

> [t]he Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless his contact with the state is such that he has "fair warning" that he may be subject to suit there. This "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from alleged injuries that "arise out of or relate to" those activities. In this way, the defendant could have reasonably anticipated being sued in the forum's courts in connection with his activities there.

---

[10] To the extent Sandpiper and PiperGear argue that Advantus cannot assert personal jurisdiction over them under Florida's long-arm statute because Advantus alleges only economic injury, see Sandpiper Motion at 11-12, PiperGear Motion at 10-11, and Sandpiper Reply at 8, the Court notes that this argument pertains only to subsection (6.) of the long-arm statute. See Identigene, Inc. v. Goff, 774 So. 2d 48 (Fla. 2d Dist. Ct. App. 2000) ("[T]o obtain long-arm jurisdiction under the provisions of section 48.193(1)(f), there must be allegations of personal-bodily-injury or property damage. Mere allegations of economic damage will simply not suffice.") (citing Aetna Life & Cas. Co. v. Therm-O-Disc, Inc., 511 So. 2d 992, 993-94 (Fla. 1987)). As such, Sandpiper and PiperGear's economic injury argument is unavailing as to the issue of personal jurisdiction under subsection (2.).

Licciardello, 544 F.3d at 1284 (internal citations omitted). Second, the Court determines whether the exercise of jurisdiction over the defendant "would offend 'traditional notions of fair play and substantial justice.'" Sculptchair, Inc., 94 F.3d at 630-31 (quoting Robinson, 74 F.3d at 258). Relevant factors to this inquiry "include 'the burden on the defendant, the interests of the forum . . . , and the plaintiff's interest in obtaining relief.'" See id. at 631 (quoting Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113 (1987)).

### B. Analysis

#### 1. Sandpiper

At the outset of the analysis, the Court emphasizes that the personal jurisdiction inquiry is conducted "as to each defendant separately," and because this is a case based on specific jurisdiction, "as to each claim separately." See KVAR Energy Sav., Inc. v. Tri-State Energy Solutions, LLP, No. 6:08-cv-85-Orl-19KRS, 2009 WL 103645, at *3 (M.D. Fla. Jan. 15, 2009); see also Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 275 (5th Cir. 2006) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil § 1351, at 299 n.30 (3d ed. 2004) ("There is no such thing as supplemental specific personal jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the basis for another claim.")). Advantus brings five claims against Sandpiper. Counts I-III are all premised on the same conduct—that Sandpiper falsely represented on its website, in catalogs, on social media, and directly to consumers and retailers that its products were made in the United States. Based on these allegations, Advantus brings claims for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count I) and Florida state law, Fla. Stat. § 817.41 (Count II), as well as a

claim for violating the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 et seq. (Count III). In addition, Advantus alleges that Sandpiper formed a civil conspiracy (Count IV) with Innovapro and PiperGear to import products and engage in this false advertising. Last, Advantus asserts that Sandpiper's sale of its assets to Innovapro violated the California Uniform Voidable Transactions Act, Cal Civ. Code § 3439 (Count V). Thus, as to Sandpiper, Counts I-IV are all premised on the same conduct— Sandpiper's alleged false advertising—and as such, the Court will address those claims together. However, as to the voidable transaction claim, the Court will consider whether Advantus has established a basis for personal jurisdiction as to that claim separately.

### a. Long-Arm Statute

Advantus contends that the Florida long-arm statute permits the exercise of personal jurisdiction over Sandpiper because Sandpiper was carrying on a business in Florida, and committed a tortious act in this state. See Response at 2-12. In support of its argument that Sandpiper was carrying on a business in Florida, Advantus relies on evidence that:

1) Sandpiper's exchange sales manager, Robert Van Jones, lives in Florida and works out of a home office in Florida. Jones' business cards, created by Sandpiper's marketing department, lists a "sales office" location in Florida. On behalf of Sandpiper, Jones managed the team of in-store merchandisers, including three merchandisers in Florida, developed relationships with store managers, including some in Florida, and visited exchange stores in person, including stores in Florida.

2) Sandpiper retained three in-store merchandisers in Florida who visited Florida exchange stores on Sandpiper's behalf to stock merchandise, check inventory, and maintain relationships with store managers. Merchandisers were required to submit to Jones inventory checklists and photographs of the displays with Sandpiper products.

3) Sandpiper used Paragon to provide additional in-store representation in Florida.

4) Sandpiper distributed the wallets which were subject to the FTC recall in Florida. See Response at 3-10. Sandpiper disagrees, maintaining that these contacts are insufficient to establish that it was carrying on a business in Florida because the merchandisers in Florida engaged in "only a very basic, minimal level of work." See Sandpiper Reply at 3-4. Sandpiper does not dispute, however, that Sandpiper goods were sold in 26 military exchanges in Florida, 9 of which were serviced by a Sandpiper merchandiser. See id. at 3. Sandpiper also contends that Jones' home office cannot be attributed to Sandpiper because Sandpiper's business is not largely or exclusively operated out of any person's residence and Sandpiper has an established office in Chula Vista, California. Id. at 4-5. With regard to its relationship with Paragon, Sandpiper asserts that Paragon's contacts with Florida cannot be attributed to Sandpiper because Paragon was an independent contractor, not Sandpiper's agent. Id. at 5-8.

Upon review, the Court finds that Sandpiper was conducting business in Florida sufficient to satisfy section 48.193(1)(a)(1.). It is undisputed that Sandpiper had at least one salaried employee and three merchandising representatives who lived in Florida and provided services on Sandpiper's behalf in Florida.[11] These employees visited stores in Florida to stock Sandpiper products and facilitate the sale of Sandpiper goods to Florida

---

[11] The Court notes that Sandpiper's internal merchandisers appear to have been independent contractors. However, as Sandpiper exercised substantial control over the activities that these merchandisers performed on its behalf, the Court finds it appropriate to attribute the conduct of these merchandisers to Sandpiper. See Sculptchair, Inc., 94 F.3d at 629 ("'The existence of a true agency relationship depends on the degree of control exercised by the principal.'" (quoting Dorse v. Armstrong World Indus., 513 So. 2d 1265, 1268 n.4 (Fla. 1987))). Indeed, Sandpiper appears to accept that the actions of these merchandisers are attributable to Sandpiper, but contends that their work was too minimal to constitute carrying on a business in Florida. See Sandpiper Reply at 4. Notably, although Sandpiper contends that the work Paragon performed as an independent contractor cannot be imputed to Sandpiper, Sandpiper does not make the same argument with respect to its internal merchandisers. Thus, for ease of reference, the Court will refer to both Jones and the internal Sandpiper merchandisers as "employees."

consumers. The employees also engaged with store managers to promote the sale of Sandpiper products and solicit additional sales of Sandpiper products to the store. While these efforts may have been minimal in comparison to Sandpiper's level of business engagement in other states, they were nonetheless purposeful, consistent and ongoing. See Sculptchair, 94 F.3d at 628 (finding sporadic sales efforts generating relatively insignificant revenue nevertheless qualified as a general course of business activity in Florida for pecuniary benefit). In addition, Jones, the exchange sales manager, worked on behalf of Sandpiper out of his home office in Florida.[12] Indeed, Sandpiper's marketing department provided Jones with a business card that identified his home address in Florida as a "sales office," and Jones maintains Sandpiper business records on his computer at that location. See Jones Dep. at 35-37. While the focus of Jones' work was on the larger exchange stores outside the state of Florida, it is undisputed that Jones also maintained relationships with store managers in Florida and periodically visited those store locations. Merely because Sandpiper's business activities in Florida were not as great as its activities in larger military markets, does not detract from the fact that Sandpiper was actively facilitating and promoting the sale of its products in Florida. Indeed, Sandpiper fails to cite any authority to suggest that a business with actual employees located in Florida, who

---

[12] Sandpiper argues that Jones' home cannot be considered a Sandpiper office for purposes of the Florida long-arm statute because Sandpiper operates out of its established office in Chula Vista, California. See Sandpiper Rely at 4-5 (citing Golant v. German Shepherd Dog Club of Am., Inc., 26 So. 3d 60 (Fla. 4th Dist. Ct. App. 2010)). In Golant, the court found that a board member's home was a de facto office within the meaning of the long-arm statute because the defendant maintained no physical office and conducted its business "largely, if not exclusively, from the homes of its Board members." See Golant, 26 So. 3d at 63. While those are not the circumstances presented in this case, it is unclear whether the facts of Golant are the only circumstances in which a home office will qualify as an "office" under the long-arm statute. But see Furnari v. Shapewriter, Inc., No. 6:10-cv-1463-Orl-28DAB, 2011 WL 253962, at *4 (M.D. Fla. Jan. 25, 2011). Regardless, even if the Court does not consider Jones' home office to be an "office" within the meaning of section 48.193(1)(a)(1.), Jones' activities on behalf of Sandpiper in Florida, particularly those activities in service of Florida stores, support a finding that Sandpiper was "engaging in" business in this state.

work on behalf of that business as to Florida customers, is nevertheless not conducting business in Florida merely because it conducts more business elsewhere.

In light of the foregoing, the Court is satisfied that Advantus has shown that Sandpiper engaged in "a general course of business activity" in Florida for Sandpiper's "pecuniary benefit." See Sculptchair, 94 F.3d at 627. Moreover, the evidence reflects that Sandpiper's business activities in Florida share a substantial connection with the false advertising and conspiracy claims at issue in this lawsuit. Indeed, Advantus contends that Sandpiper obtained a competitive advantage over Advantus by falsely representing to military exchange buyers that Sandpiper products were made in the United States. These same products were then sold in Florida military exchange stores, as facilitated by Jones and the in-store merchandisers in Florida. Advantus also contends that Sandpiper engaged in nationwide advertising falsely promoting its products as made in the USA, including on its website. From this website, Sandpiper sold products directly to consumers in Florida. Moreover, the allegedly mislabeled wallets, which were subject to the FTC recall, were sold in Florida exchange stores. Accordingly, the Court finds a sufficient nexus between Sandpiper's activities promoting the sale of its products in Florida and the false advertising claims in this case, and indeed, Sandpiper fails to present any argument to the contrary.[13] Because the Court finds that Advantus has carried its burden of showing that Sandpiper's activities satisfied section 48.193(1)(a)(1.) with respect to Counts I-IV, the Court need not consider whether Sandpiper committed a tortious act in Florida within the meaning of section 48.193(1)(a)(2.) as to those claims.

---

[13] Instead, Sandpiper maintains that Advantus' claims are not related to Florida because Sandpiper does not have any direct contact with the state of Florida other than a few, individual internet sales. See Sandpiper Motion at 14. However, as stated above, the Court rejects Sandpiper's contention that it was not conducting business in Florida at times relevant to the claims in this action.

However, in addition to the false advertising and conspiracy claims, Advantus also brings a claim against Sandpiper under the California Uniform Voidable Transactions Act. Although Sandpiper seeks dismissal of all counts, neither Sandpiper nor Advantus address the issue of personal jurisdiction as to this claim specifically.   Upon review, the Court finds that Florida's long-arm statute does not extend jurisdiction over this state law voidable transaction claim.   First, under Florida law, a claim seeking to void a fraudulent transfer is not an independent tort upon which long-arm jurisdiction can be premised.   See <u>Burris v. Green</u>, No. 3:12cv521-MCR-CJK, 2016 WL 5844165, at *4 (N.D. Fla. Aug. 26, 2016) (collecting cases).   Second, while the Court finds that Sandpiper was carrying on a business in Florida, Advantus' California state law voidable transaction claim does not "arise from" those activities.   The voidable transaction claim pertains to the sale of the assets of one California company to another California company, in California.   There are no allegations to suggest that Sandpiper's activities in Florida, or any of the four employees living in Florida, had any connection to the asset purchase in California.   Thus, because Advantus has not shown any nexus between the alleged voidable transaction in California and Sandpiper's business activities in Florida, the Court finds no basis to exercise long-arm jurisdiction over Sandpiper with respect to Count V.

### b.  Due Process

Next, Sandpiper argues that an exercise of personal jurisdiction over it in this case fails to comport with due process.   <u>See</u> Sandpiper Motion at 13-20.   Sandpiper contends that because it did not <u>directly</u> sell or advertise its products in Florida, other than through a small number of internet sales, "the requisite causal relationship" between Sandpiper, Florida, and the litigation does not exist.   <u>See</u> <u>id.</u> at 14.   Sandpiper also maintains that it

does not have sufficient "minimum contacts" with Florida to confer personal jurisdiction, and that the exercise of jurisdiction in this matter would "offend 'traditional notes of fair play and substantial justice.'" Id. at 17-20. As stated above, the Court will first consider whether Sandpiper has sufficient "minimum contacts" with Florida, including whether those contacts are related to this litigation, and then determine whether the exercise of personal jurisdiction over Sandpiper comports with "fair play and substantial justice."

### i. Minimum Contacts

The minimum contacts analysis requires the Court to consider three criteria: (1) "the contacts must be related to the plaintiff's cause of action or have given rise to it," (2) "the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws," and (3) "the defendant's contacts within the forum state must be such that [it] should reasonably anticipate being haled into court there." See Sculptchair, Inc., 94 F.3d at 631. When faced with an intentional tort case such as this one, there are two potentially applicable tests for assessing the purposeful availment prong: 1) the Calder[14] effects test, and 2) the traditional purposeful availment analysis. See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1356 (11th Cir. 2013). Sandpiper argues that Advantus cannot satisfy either test. See Sandpiper Motion at 15-19. For the reasons set forth below, the Court finds that Advantus has shown purposeful availment under the traditional minimum contacts analysis, and as such, the Court need not analyze the "effects" test in this case. See Louis Vuitton Malletier, 736 F.3d at 1357.

---

[14] Calder v. Jones, 465 U.S. 783 (1984).

This lawsuit arises out of claims that Sandpiper falsely advertised in its catalogs, on its website, on social media, in direct mailings to consumers, and in oral presentations to the military buyers that its products are made in the United States.   Sandpiper's website and social media pages, are accessible nationwide, and Sandpiper sold products directly to consumers through its interactive website, including consumers in Florida.   Sandpiper also sold products worldwide, including in Florida, through its established relationship with military exchange stores, among other retail outlets.   Advantus' claims include the contention that Sandpiper placed a tag on a series of wallet products which falsely indicated that the wallets were made in the United States when in reality they were assembled in Mexico.   Advantus also contends that Sandpiper misled the military buyers about the manufacture of these wallets, which led to the military's decision to carry this wallet in its exchange stores.   It is undisputed that some of these wallets were sold in military exchange stores in Florida.

Sandpiper contends, however, that these sales in Florida were indirect and minimal, such that its contacts with Florida are not related to the claims in this lawsuit, and it has not "purposefully availed" itself of this forum.   See Sandpiper Motion at 14, 17-19. Sandpiper characterizes its activities as akin to the defendant in Asahi where the stream of commerce "'eventually swept defendant's product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum state.'" See Sandpiper Motion at 17-18 (quoting Asahi, 480 U.S. at 110).   The Court is not persuaded.   Although the law concerning the "stream of commerce" test is unsettled, even under the more stringent "stream of commerce plus" analysis, jurisdiction over Sandpiper is proper in this case.   See Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1546-48

(11th Cir. 1993); see also J. McIntyre Machinery, Ltd. v. Nicastro, 564 U.S. 873, 877-87 (2011) (revisiting the stream of commerce test).   The plurality in Asahi set forth the "stream of commerce plus" test as follows:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

See Asahi Metal Indus. Co., 480 U.S. at 112; see also Vermeulen, 985 F.2d at 1547. Here, Sandpiper's products were not unpredictably swept into Florida.   Rather, Sandpiper delivered its products into the "stream of commerce" with the intent and expectation that they would be sold to consumers in Florida.   Indeed, in 2016, Sandpiper generated nearly $175,000 in sales in Florida, over $200,000 in 2017, and in 2018, had generated over $200,000 in sales by the time of Innovapro's take-over.   See Wu Decl. ¶ 43.   While these sales may be minor in comparison to Sandpiper's revenues elsewhere, they are not fortuitous or sporadic, but rather the result of Sandpiper's intentional efforts to serve, albeit indirectly, the market for its product in Florida.   Sandpiper's arrangement with the military exchange buyers plainly contemplated the regular and predictable distribution of Sandpiper goods in Florida.   See Candy Craft Creations, LLC v. Gartner, CV 212-091, 2013 WL 12180699, at *6 (S.D. Ga. Feb. 4, 2013).

To the extent something more is required, Sandpiper engaged in additional conduct to purposefully avail itself of the privilege of conducting business in Florida.   See Vermeulen, 985 F.2d at 1547-50.   Sandpiper actively facilitated and promoted the sale of its products at the individual store level, through the efforts of Jones and the team of in-

store merchandisers.   While Florida has been a relatively minor market for these products, Sandpiper nevertheless intentionally endeavored to serve the Florida market by employing three Florida merchandisers to service the military exchange stores in Florida, in addition to the work Jones performed visiting Florida stores and maintaining relationships with store managers.   Sandpiper also sold its products directly to Florida consumers through its website, which contained the misleading advertisements at issue in this lawsuit.   See Louis Vuitton Malletier, 736 F.3d at 1357-58 (finding purposeful availment prong satisfied where defendant operated interactive website accessible in Florida through which it sold and distributed infringing products to Florida consumers); see also Savvy Rest, Inc. v. Sleeping Organic, LLC, No. 3:18CV00030, 2019 WL 1435838, at *5 (W.D. Va. Mar. 29, 2019) (finding that "even if [company] did not specifically target [forum] customers, it purposefully availed itself of the privilege of conducting business in the state," by using website to sell products to customers in that state).

Despite these facts, Sandpiper contends that its Florida sales have made up only a small percentage of its overall sales and are therefore insufficient to satisfy the minimum contacts test.   However, it is the "'quality of [the] contacts,' and not their number or status, that determine whether they amount to purposeful availment."   See CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1265 (6th Cir. 1996) (alteration in original) (quoting Reynolds v. Int'l Amateur Athletic Federation, 23 F.3d 1110, 1119 (6th Cir. 1994)); Wish Atlanta, LLC v. Contextlogic, Inc., No. 4:14-CV-00051 (CDL), 2014 WL 5091795, at *5 (M.D. Ga. Oct. 9, 2014) ("[P]ersuasive authority suggests that a corporation purposefully avails itself of a forum when the corporation derives revenue from the forum state, even when that revenue represents only a small percentage of the corporation's total annual revenue." (citing, e.g.,

Illinois v. Hemi Grp. LLC, 622 F.3d 754, 755, 757 (7th Cir. 2010))); Auburn Manuf., Inc. v. Steiner Indus., 493 F. Supp. 2d 123, 125, 130 (D. Maine 2007).   Here, as discussed above, Sandpiper's sales in Florida are not fortuitous, random or isolated.   Rather, Sandpiper purposefully and consistently avails itself of the Florida market for the sale of its products through the efforts of its in-store merchandisers and exchange sales manager. While Sandpiper may have focused more of its efforts on larger markets, Sandpiper nevertheless purposefully availed itself of the privilege of doing business in Florida such that it could reasonably anticipate being haled into court in this forum.

In addition, the Court finds that these contacts are related to the claims at issue in this lawsuit.   Advantus alleges that Sandpiper engaged in false advertising in its catalogs, on its website, on social media, in direct mailings to consumers, and in oral presentations to the military buyers by misrepresenting that its products were made in the United States. Consumers in Florida accessed Sandpiper's website, which contained the allegedly misleading information, to make direct purchases of Sandpiper products.   See Savvy Rest, Inc., 2019 WL 1435838, at *6.   And, the misleading oral representations to military buyers purportedly led to the sale of Sandpiper products in military exchange stores in Florida, including the wallet series of products with the misleading tag.   Thus, Florida consumers are included in those consumers nationwide who were subjected to the allegedly false advertising, and Advantus suffered competitive harm in Florida.   Because Advantus' claims "arise out of or relate to" Sandpiper's efforts to advertise and sell its products nationwide, including in Florida, the Court finds that Advantus has established that Sandpiper's Florida contacts are sufficiently related to the subject matter of this

lawsuit. Accordingly, the Court finds that Advantus has satisfied the minimum contacts test of the due process analysis.

### ii. Fair Play and Substantial Justice

Next, the Court considers whether the exercise of personal jurisdiction over Sandpiper comports with "'fair play and substantial justice.'" See Licciardello, 544 F.3d at 1284 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)). Factors relevant to this analysis include: "the burden on the defendant of litigating in the forum, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute." Id. "Where these factors do not militate against otherwise permitted jurisdiction, the Constitution is not offended by its exercise." Id. Indeed, "'[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the [non-resident] defendant.'" See Vermeulen, 985 F.2d at 1551 (first alteration in original) (quoting Asahi, 480 U.S. at 114).

In this case, the plaintiff is a Florida corporation allegedly injured by Sandpiper's use of false advertising to promote its products in competition with the plaintiff. Moreover, Florida has an interest in protecting not only its corporations from competitive harm, but also its consumers from misleading advertisements. While Sandpiper is burdened by having to litigate a lawsuit outside of California, "'modern methods of transportation reduce this burden significantly.'" See Candy Craft Creations, LLC, 2013 WL 12180699, at *4 (quoting Robinson, 74 F.3d at 258-59); see also Sculptchair, Inc., 94 F.3d at 632. In sum, "this is not 'one of those rare cases in which minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even

[though] the defendant has purposefully engaged in forum activities.'" <u>Vermeulen</u>, 985 F.2d at 1552 (quoting <u>Asahi</u>, 480 U.S. at 116).

### 2. Innovapro

With respect to Counts I-III, Advantus contends that the Court may exercise personal jurisdiction over Innovapro on two theories. First, Advantus contends that personal jurisdiction is proper because Innovapro is subject to successor liability for Sandpiper's tortious activity. <u>See</u> Response at 18-25. In addition, Advantus argues that Innovapro is directly liable for continuing to engage in false advertising after the asset purchase, and this conduct subjects Innovapro to personal jurisdiction in Florida. <u>See</u> Response at 25-30. Advantus also brings a claim against Innovapro for civil conspiracy (Count IV). According to Advantus, Innovapro imported goods from China "to facilitate [Sandpiper] and PiperGear's false claims that their various goods and products were 'Made in the USA.'" <u>See</u> Complaint ¶ 67. The conspiracy culminated in Innovapro's purchase of Sandpiper's assets following the FTC investigation. <u>Id.</u> ¶ 68. Last, Advantus alleges that Innovapro's purchase of Sandpiper's assets violated California state law under the Uniform Voidable Transactions Act (Count V). Advantus fails to directly address the basis for personal jurisdiction over Innovapro as to Counts IV and V in its Response. Nonetheless, as stated above, the Court must consider whether there is a basis for personal jurisdiction as to each claim.

### a. Direct Liability – Counts I-III

As to Counts I-III of the Complaint, Advantus contends that this Court has personal jurisdiction over Innovapro for its continued misrepresentations about the manufacture of Sandpiper products after it purchased the Sandpiper brand. <u>See</u> Response at 25.

Specifically, in the Response, Advantus asserts that Innovapro continued misrepresenting the manufacture of Sandpiper products in three ways: 1) the Sandpiper Facebook page continued to include references to "the growth and success of our US manufacturing," 2) Sandpiper's website continued to: refer to its products as being manufactured in the United States or North America, represent that PiperGear was Sandpiper's sister company that manufactured bags in the United States, and include Sandpiper's catalog with the false or misleading representations regarding Berry Amendment and NAFTA compliance, and 3) at a January 2019 trade show in Las Vegas, Nevada, the official directory and buyers guide contained a misleading description of the Sandpiper brand.   See id. at 25-26.   Advantus contends that because Innovapro distributed false representations in Florida and maintained Sandpiper's Florida contacts, the Court may exercise personal jurisdiction over Innovapro as to these direct claims.   See id.   Significantly, Advantus fails to specifically address whether this theory of direct liability satisfies the requirements of the Florida long-arm statute.   Nonetheless, Advantus' arguments appear to rely on subsections (1.) and (2.) of section 48.193(1)(a).

As stated above, section 48.193(1)(a)(2.) authorizes the exercise of jurisdiction over a non-resident defendant who commits a tortious act within Florida.   Prior to addressing whether Advantus' allegations of tortious conduct support jurisdiction, the Court must first determine whether the allegations adequately state a cause of action.   See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V., 598 F.3d 802, 808 (11th Cir. 2010).   In Count I of the Complaint, Advantus alleges a claim for false advertising under the Lanham Act.   A plaintiff must allege the following elements to state a false advertising claim under § 43(a)(1)(B) of the Lanham Act:

> (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

See Hickson Corp. v. No. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004). The Court is satisfied that Advantus has pled a prima facie case of false advertising under the Lanham Act based on allegations that after Innovapro purchased Sandpiper's assets: the Sandpiper website and social media pages continued to represent that Sandpiper was affiliated with PiperGear which manufactured products that were made in the USA and/or Berry Amendment compliant, see Complaint ¶¶ 13a, 13d, 31, such advertisements were false because Innovapro's products were not made in the United States, id. ¶¶ 14, 41, these advertisements had a tendency to deceive consumers who believed they were purchasing goods made in the United States, id. ¶ 40, the representations concerning the origin of the products "were material in that they likely influenced purchasing decisions," id. ¶ 42, the products and advertisements were distributed nationwide, id. ¶ 45, and Advantus, as a direct competitor, was damaged by these false advertisements, id. ¶¶ 11, 46.[15]

---

[15] Innovapro contends that it is not liable for the alleged misrepresentations on Sandpiper's Facebook page and website because it ultimately removed those representations. See Innovapro Motion at 8-9. Innovapro's argument appears to be that because it was not the entity that originally put the misleading statements on the Sandpiper website and Facebook page, it cannot be held liable for their continued presence on those websites after the asset purchase. Id. Innovapro cites no authority in support of this proposition, and on this limited record, construing the facts in the light most favorable to Advantus, the Court finds Innovapro's argument unavailing. See Vector Prods., Inc. v. Hartford Fire Ins. Co., 397 F.3d 1316, 1319 (11th Cir. 2005) ("It is well-settled that no proof of intent or willfulness is required to establish a violation of Lanham Act § 43(a) for false advertising. Rather, Section 43(a) provides a strict liability tort cause of action." (internal footnotes and citations omitted)); see also Brennan v. Roman Catholic Diocese of Syracuse New York, Inc., 322 F. App'x 852, 855 (11th Cir. 2009) ("[A] motion to dismiss a tort claim for lack of personal jurisdiction under Florida's Long-Arm Statute does not require a full-scale inquiry into whether the defendant committed a tort. Instead, when a plaintiff alleges a claim, and the record is in dispute as to the accuracy of the claim, we can construe the facts in the light most favorable to the plaintiff and hold that the alleged claim satisfies Florida's Long-Arm Statute.").

Nonetheless, Innovapro contends that these allegedly tortious actions cannot confer specific personal jurisdiction over Innovapro because "Advantus never established any connection between the statements on the website and Florida." See Innovapro Reply at 6. In Louis Vuitton Malletier, the Eleventh Circuit found that a nonresident defendant had committed a tortious act, trademark infringement, in Florida, where the defendant created a website with the allegedly infringing material which was accessible in Florida, and then sold those goods to Florida customers through that website. See Louis Vuitton Malletier, 736 F.3d at 1354. Indeed, in the context of a claim for defamation, the Florida Supreme Court has held that:

> By posting allegedly defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to readers worldwide, including potential readers within Florida. When the posting is then accessed by a third party in Florida, the material has been 'published' in Florida and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida.

See Internet Solutions Corp. v. Marshall, 39 So. 3d 1201, 1214 (Fla. 2010). Based on the reasoning of Internet Solutions and Louis Vuitton Malletier, the Court finds that Advantus presents a sufficient claim that Innovapro has engaged in false advertising in Florida. Advantus presents evidence that Innovapro's website contained false or misleading information about Innovapro's products. Moreover, this website was not only accessible in Florida, but actually accessed in Florida given that Innovapro has made at least "three online sales delivered to Florida since Innovapro took over" the Sandpiper website. See Wu Decl. ¶¶ 41-43. Thus, the evidence viewed in the light most favorable to Advantus suggests that Innovapro has communicated allegedly false advertisements into Florida, in connection with the sale of its products to Florida consumers, in competition with Advantus.

Pursuant to Louis Vuitton Malletier, and Internet Solutions, the Court finds this conduct is sufficient to demonstrate that Innovapro engaged in tortious activity in Florida sufficient to satisfy the requirements of section 48.193(1)(a)(2.).[16]

This conduct also satisfies the requirements of due process. As in Louis Vuitton Malletier, Innovapro "purposefully solicited business from Florida residents through the use of at least one fully interactive, commercial website," and "[a]s a result of this Internet advertising," Innovapro received multiple orders to ship goods into Florida. See Louis Vuitton Malletier, 736 F.3d at 1357. Although the existence of an interactive website alone may not "give[] rise to purposeful availment anywhere the website can be accessed," in this case, as in Louis Vuitton Malletier, Innovapro had other contacts with Florida. Id. Innovapro sold and distributed its products through this website to Florida consumers, and the false advertising cause of action derives directly from these contacts—Innovapro's sale of its goods in Florida in connection with false or misleading advertisements. Id. at 1357-58. Accordingly, Advantus' claims against Innovapro satisfy both the relatedness and the purposeful availment prong of the due process analysis. See id. at 1355-58; see also Savvy Rest, Inc., 2019 WL 1435838, at *5-6. Last, as to fair play and substantial justice, the Court finds this prong is satisfied for the same reasons stated above as to Sandpiper. Because the Court finds that it may exercise personal jurisdiction over Innovapro as to the

---

[16] Advantus also brings a claim for false advertising based on Florida state law as well as a FDUTPA claim against Innovapro. See Complaint at 13-17. Both of these claims are premised on the same allegedly misleading advertisements, and in presenting their arguments on personal jurisdiction, the parties make no effort to address these claims separately. As such, the Court will not analyze those claims separately.

claims set forth in Counts I-III based on Advantus' direct liability theory of relief, the Court need not consider Advantus' successor liability theory.[17]

### b. Conspiracy – Count IV

Next, Advantus alleges that Innovapro participated in a conspiracy with Sandpiper and PiperGear. The conspiracy pertains to different conduct than that supporting Advantus' claims for direct liability, as it covers Innovapro's conduct as an importer of Sandpiper's goods and then purchaser of its assets. See Complaint ¶¶ 67-68. Significantly, Innovapro's conduct in support of the conspiracy occurred entirely in California. Nevertheless, the Florida long-arm statute "can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." See United Techs. Corp., 556 F.3d at 1281-82; see also Execu-Tech Business Sys., Inc. v.

---

[17] However, to the extent consideration of the successor liability theory is necessary, Advantus has failed to carry its burden to establish personal jurisdiction on this basis. Under Florida law, "[a] corporation that acquires the assets of another business entity does not as a matter of law assume the liabilities of the prior business." See Corporate Exp. Office Prods., Inc. v. Phillips, 847 So. 2d 406, 412 (Fla. 2003). Nevertheless, in Florida, as well as the "vast majority of jurisdictions," there are certain exceptions whereby a purchaser can be subject to successor liability. See Bernard v. Kee Mfg. Co., Inc., 409 So. 2d 1047, 1049 (Fla. 1982). An asset purchaser can be subject to the liabilities of the selling predecessor where: "(1) the successor expressly or impliedly assumes obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." Id. Here, Advantus argues that Innovapro is subject to successor liability under the "mere continuation" and fraudulent transaction exceptions. However, as discussed below, Innovapro has presented evidence rebutting Advantus' allegations that Innovapro and Sandpiper shared common ownership which Advantus fails to challenge. Thus, Advantus cannot rely on the "mere continuation" theory of successor liability. See Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458-59 (11th Cir. 1985); see also Natural Chem. L.P. v. Evans, No. 6:13-cv-1607-Orl-31KRS, 2015 WL 12843835, at *3 (M.D. Fla. June 2, 2015) ("Without any overlap in the officers, directors, or stockholders, there is no basis to find that [purchaser] was a mere continuation of [seller]."); Mitutoyo Am. Corp. v. Suncoast Precision, Inc., No. 8:08-mc-36-T-TBM, 2011 WL 2802938, at *5 (M.D. Fla. July 18, 2011) (explaining that a "'key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation'" (internal quotation omitted)). Likewise, Innovapro presents evidence, discussed below, that the APA was a good faith, arm's length transaction. Advantus fails to present any evidence raising an issue of fact on this issue, and as such, cannot rely on the fraudulent transfer exception to establish successor liability either.

New Oji Paper Co. Ltd., 752 So. 2d 582, 585-86 (Fla. 2000).   However, "if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy," then Florida courts decline to apply the co-conspirator theory to extend personal jurisdiction over a non-resident defendant.   See NHB Advisors, Inc. v. Czyzyk, 95 So. 3d 444, 448 (Fla. 4th Dist. Ct. App. 2012).   Thus, to extend personal jurisdiction over Innovapro as to the conspiracy claim, Advantus must adequately allege Innovapro's involvement in this conspiracy, and where these allegations are rebutted, offer evidence that Innovapro participated in a conspiracy with Sandpiper and PiperGear sufficient to survive a directed verdict.

In its Motion, Innovapro argues that it is not subject to personal jurisdiction on the basis of conspiracy liability.   See Innovapro Motion at 9-10.   In support, Innovapro argues that there are no factual allegations in the Complaint from which to infer that Innovapro formed an agreement with Sandpiper and PiperGear in connection with the alleged false advertising, or that it even knew these Defendants were engaged in false advertising.   Id. at 10-11.   Innovapro submits the Declaration of James Wu in which he states that the FTC has not made any false origin allegations "concerning any goods imported by Innovapro or produced by Sun Fai, all of which bear 'MADE IN CHINA' labels that are sewn into the fabric of the product."   See Wu Decl. ¶ 27.[18]   Innovapro also comes forward with evidence

---

[18] Wu's contention that the FTC's allegations do not concern Innovapro's goods is too broadly stated.   The FTC alleges that Sandpiper and PiperGear "represented, expressly or by implication, that all of their backpacks, travel bags, and other products are all or virtually all made in the United States," when in fact "more than 95% of Respondent Sandpiper's products are imported as finished goods, and approximately 80% of Respondent PiperGear's products are either imported as finished goods or contain significant imported components."   See Complaint, Ex. A at 3 (emphasis added).   Since the FTC accused Sandpiper and PiperGear of misrepresenting the origin of "virtually all" of their products, this necessarily implicates products imported by Innovapro.   Nonetheless, in context, the Court construes Wu's statement to mean that the FTC has not alleged that any of the products imported by Innovapro were mislabeled.   Rather, the FTC

that the asset purchase was a good-faith, arm's-length transaction in satisfaction of a debt that was owed by Sandpiper to Innovapro.

In its Response to the Motion, Advantus does not cite to any evidence to support the exercise of personal jurisdiction over Innovapro based on its participation in the alleged conspiracy. See Response at 18-30. Indeed, Advantus does not specifically address whether the Court may exercise personal jurisdiction over the conspiracy claim as to Innovapro. However, in the Rule 12(b)(6) portion of its brief, Advantus does respond to Innovapro's argument that its conspiracy allegations are too conclusory. See id. at 39-40. In addition, Advantus does present argument and evidence in support of its contention that the asset purchase was a fraudulent transaction. See id. at 18-24. Accordingly, the Court will consider these arguments in determining whether Advantus has adequately alleged Innovapro's knowledge, and whether these allegations are sufficient to satisfy Advantus' burden of establishing personal jurisdiction in light of the evidence presented.

Under Florida law, the elements of a conspiracy are as follows:

> "(a) An agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to a plaintiff as a result of the acts done under the conspiracy."

See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott, 561 F. App'x 882, 886 (11th Cir. 2014) (quoting Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997)). Significantly, "[a] conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy." See Donofrio v. Matassini, 503 So. 2d 1278, 1281

---

identified "certain wallets" which were sold with "cards that prominently displayed false U.S.-origin claims," but these wallets came from Mexico and were not imported by Innovapro. Id.

(Fla. 2d Dist. Ct. App. 1987).   Nonetheless, a conspirator must "know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." Id.; see also Cordell Consultant, Inc., 561 F. App'x at 886.   Thus, to adequately allege a conspiracy to engage in false advertising between Sandpiper, PiperGear and Innovapro, Advantus must set forth factual allegations from which one can draw the reasonable inference that Innovapro knew that Sandpiper and PiperGear were falsely advertising the imported goods as American made.

Setting aside those allegations which are bare conclusions,[19] Advantus alleges the existence of a conspiracy based on the following:

1) James Wu is the principal owner and officer of Innovapro and "also had an ownership interest in SOC for several years.  Thus, there has been a substantial overlap in the ownership and control of these two entities at all times material to this case."  See Complaint ¶ 19.   Wu also had an ownership interest in Sun Fai, the company which owns the Chinese factory where Sandpiper's goods are made.  Id. ¶ 20.

2) "For years, [Sandpiper] and PiperGear advertised PiperGear as 'produc[ing] US made sewn goods and product development with manufacturing solutions to meet US Government contract requirements including GSA and Berry Amendment.'"  Id. ¶ 22.

---

[19] Advantus alleges that Innovapro "actively participated" in the "scheme," see Complaint ¶ 21, "knew that [Sandpiper] and PiperGear were making these [made in the USA] claims, id. ¶ 22, and "knew these claims to be false," id.  Advantus further alleges "[u]pon information and belief" that Innovapro was "knowingly or negligently helping [Sandpiper] and PiperGear conceal the foreign origin of the various products that [Sandpiper] and PiperGear were then claiming to have manufactured domestically."  Id. ¶ 25 (emphasis added).  According to Advantus, "Innovapro conspired with [Sandpiper] and PiperGear to import goods into the United States to facilitate [Sandpiper] and PiperGear's false claims that their various goods and products were "Made in the USA."  Id. ¶ 67.  Advantus maintains that "Innovapro took acts in furtherance of this conspiracy by importing goods as consignee from China into the United States with actual or constructive knowledge that [Sandpiper] and PiperGear were selling the Chinese goods as American made goods."  Id. ¶ 68 (emphasis added).  The mere fact that Innovapro imported Sandpiper's goods does not, without more, plausibly support an inference of conspiracy.  See Twombly, 550 U.S. at 557 ("The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'").  Moreover, the general allegations of knowledge are entirely conclusory and thus, not to be considered for purposes of determining whether Advantus has alleged sufficient factual allegations to support an inference of knowledge or agreement.  See Iqbal, 556 U.S. at 680-81 (rejecting "bare assertions" of knowledge and intent as "conclusory and not entitled to be assumed true").

3) "Despite these advertisements, Innovapro, as consignee (and whose owner also owned both part or all of the Chinese factory making the [Sandpiper] goods . . . ), shipped goods from China to the United States bearing PiperGear purchase order numbers.  For example, a September 2017 shipment from Sun Fai to Innovapro of [Sandpiper] goods included a PO No.: 'PG17-8118.'  That is, a Chinese factory (that Innovapro's owner also owned part or all of) shipped completed Chinese-goods into the country to Innovapro using a purchase order from [Sandpiper's] 'U.S. made sewn goods' company, <u>i.e.</u>, Defendant PiperGear—which PiperGear then sold as American made or Berry Amendment compliant.   There are instances of this occurring in 2015 and 2016 as well, with the first occurrence being as far back as 2010."   <u>Id.</u> ¶ 23.

4) "At all times prior to August 31, 2018 that are material to this Complaint, Innovapro was the primary consignee of record for goods that [Sandpiper] imported into the United States for resale under the [Sandpiper] brand, and Innovapro imported virtually nothing but [Sandpiper] goods, including some shipments which contained PiperGear purchase order numbers.  Innovapro listed its address as consignee as Wu's private residence in La Jolla, California (near San Diego)."   <u>Id.</u> ¶ 24.

In addition, Advantus alleges that after the FTC notified Sandpiper and PiperGear that it was investigating them for false advertising, Innovapro took over the Sandpiper brand through a voluntary asset purchase, made to appear as the foreclosure of a secured loan, and with "no apparent exchange of consideration."   <u>See id.</u> ¶¶ 26-30, 68.

Upon review of the record, the Court first determines that Advantus' allegation that Wu had an ownership interest in Sandpiper is rebutted by the evidence.   Specifically, in his Declaration, Wu asserts that "none of the management or ownership of Sandpiper is or ever was part of the ownership or management of Innovapro."   <u>See</u> Wu Decl. ¶ 28. Jacobs' deposition testimony also supports the conclusion that he, and potentially his ex-wife, were the only owners of Sandpiper.   <u>See</u> Jacobs Dep. at 154.   Nonetheless, Advantus argues that Wu appears to have some "equity claim" in Sandpiper based on Wu's deposition testimony that Jacobs "used [Wu's] capital" to run his business and a vague reference to "some type of profit sharing agreement."   <u>See</u> Response at 22; Wu

Dep. at 90-91, Ex. 32. However, read in context, Wu's testimony appears to refer to debt, see Wu Dep. at 90, and Advantus' contention that one can infer an ownership interest from this vague and ambiguous testimony, which Advantus' counsel made no effort to further elucidate, is pure speculation.[20]

Next, the Court turns to Advantus' allegation that Innovapro agreed to participate in the false advertising scheme because Innovapro imported "virtually nothing but [Sandpiper] goods," Sandpiper advertised PiperGear as producing U.S.-made goods, and there were "instances" where Innovapro imported shipments of Chinese-made products with PiperGear purchase order numbers. See Complaint ¶¶ 22-24. Significantly absent from the Complaint are any factual allegations to support the inference that Innovapro knew about Sandpiper's misleading advertisements, much less that Innovapro knew that the specific products imported with the PiperGear purchase order numbers were included in those products sold or promoted as U.S.-made. Specifically, Advantus alleges that Sandpiper and PiperGear made false representations as to the origin of their products on Facebook, in the Frequently Asked Questions section of Sandpiper's website, in their catalogs, directly to consumers through the internet and mail, and in oral presentations to military buyers. See Complaint ¶ 13. Advantus fails to allege how or why Innovapro

---

[20] This exchange proceeded as follows:

> Q. There is a $1,100,000 entry for each year under the AAFES direct import, and then a $900,000 entry for each year under the ship to SOC. Do you see that?
> A. Yes.
> Q. What are those numbers referring to?
> A. Those are the $2 million I want Mr. Jacobs to pay back ASAP. So I told him you used my capital to run your business. I want one-third of the profit you're generating.
> Q. And is that what that profit-sharing line down below means?
> A. Yes.
> Q. And the interest down below, . . . Do you know what interest rate you used for that interest component listed down there?
> A. 9 percent, I believe.

See Wu Dep. at 90-91, Ex. 32.

would have been aware of these misrepresentations and known that they pertained to goods imported by Innovapro.   For example, although Advantus alleges that Sandpiper used an American flag symbol to misleadingly label products in its catalog as U.S.-made, Advantus does not assert that any of the wrongfully labeled products in the catalog were products imported by Innovapro.   Id. ¶ 13b.-c.   Additionally, there are no allegations that Innovapro played any role in developing or reviewing the content of Sandpiper's advertising, had any oversight or authority over those advertisements, or took any affirmative steps to mislabel or conceal the Chinese-origin of the imported goods.   Indeed, Innovapro rebuts the inference that it acted to conceal the Chinese-origin of these products with evidence that all of the products imported by Innovapro contained "MADE IN CHINA" sewn-in labels.   See Wu Decl. ¶ 27.

Last, Advantus attempts to show a conspiratorial agreement based on allegations that Innovapro purchased Sandpiper's assets soon after learning of the FTC investigation and "without receipt of reasonably equivalent value and making the transaction appear as the foreclosure of a secured loan."   See Complaint ¶ 17.   Innovapro rebuts this allegation with Wu's Declaration in which he explains the circumstances that led to the APA. Specifically, Wu states that Sandpiper had purchased over $25 million in goods from Innovapro and Sun Fai on credit accounts since January 2015, "and by the early spring of 2018, the combined debt owed by Sandpiper to Innovapro and Sun Fai exceeded $10 million."   See Wu Decl. ¶¶ 14-15.   Wu explains that Sun Fai assigned its debt to Innovapro for collection and the entities "attempted to negotiate a workout whereby the debt would be reduced and paid off over time."   Id. ¶ 17.   According to Wu, "[a]s part of those negotiations, Sandpiper agreed to secure the debt in exchange for a temporary

forbearance on collection proceedings," and "Innovapro filed a UCC-1 financing statement in July of 2018 against Sandpiper in California to perfect its security interest." Id. ¶ 18. When "a workout proved not to be feasible," Innovapro and Sandpiper agreed to resolve the debt through a transfer of assets from Sandpiper to Innovapro, resulting in the APA executed on August 31, 2018. Id. ¶¶ 19-21, Ex. A. Thereafter, Innovapro terminated its UCC-1 financing statement because "Innovapro had acquired most of the assets that were listed in the financing statement and the remaining assets retained by Sandpiper were no longer encumbered as the debt had been forgiven." Id. ¶ 32.

In its Response, Advantus cites to no evidence which rebuts or undermines the veracity of Wu's account of the asset purchase. Indeed, Advantus does not offer any evidence that this debt did not actually exist, was not actually due, or was anything other than a bona fide debt owed by a customer to its supplier. While Advantus questions the timing of the negotiations, Jacobs explained in unrebutted testimony that Sandpiper had attempted to pay back a portion of this debt through a series of post-dated checks in April of 2018. See Jacobs Dep. at 107-08. However, "the subsequent checks bounced," and "that's what probably precipitated the negotiations as far as, you know, [']Dave [Jacobs], this isn't working. Let's try to work something else out.[']" See id. at 108. Innovapro submits emails exchanged throughout May of 2018 between legal counsel for Innovapro and Sandpiper, documenting their efforts to resolve the outstanding debt. See Innovapro Reply, Ex. C. These emails reflect that Innovapro demanded assurance of payment on the money it was owed, and Sandpiper needed to ensure that its supply chain from Innovapro would continue. See id., Ex. C at INNOVAPRO.000267-268; see also Jacobs Dep. at 122-23, Ex. 52: Extension Agreement. Moreover, Advantus presents no evidence

to suggest that the value of Sandpiper's assets exceeded the $10 million debt that was owed such that the asset purchase fraudulently deprived future creditors of a remedy. Indeed, rather than exceed the value of the debt, Advantus does not appear to dispute that Innovapro ultimately forgave the balance of the debt that was left unsatisfied by the asset purchase.   See Response at 20-21; see also APA at 5.   Thus, Advantus fails to present any evidence to create an issue of fact on the adequacy or legitimacy of the $10 million debt as consideration supporting the APA.

Instead, Advantus relies on the following arguments to support its theory that the asset purchase was a fraudulent transfer:

1) The parties excluded from the asset purchase agreement the purported "loans" that Sandpiper had extended to David Jacobs and PiperGear.  According to Advantus, this "allowed Pipergear and Mr. Jacobs to loot $4,500,000 from Sandpiper after it was insolvent."   See Response at 20.

2) "No one obtained a fairness opinion or valuation assessment of the Sandpiper brand prior to closing on the asset purchase," and Innovapro merely forgave the balance of the debt Sandpiper owed to Innovapro and Sun Fai.   Id. at 20-21.

3) As part of the Asset Purchase Agreement, Sandpiper was required to terminate all of its employees.   Many of these employees either were not terminated, or were terminated and then immediately re-hired by Innovapro.   See id. at 21.

4) Innovapro agreed to pay Jacobs $11,000/month as a consultant for two years following the asset purchase, as well as a commission on any new business. Jacobs has not performed any services on behalf of Innovapro.   Id.

5) Sandpiper was Innovapro's only customer and at some point "appears to have had some type of profit sharing agreement."   Id. at 22.   Prior to the take-over, Sandpiper and Innovapro entered into an Extension Agreement to allow Wu to supervise Sandpiper's activities for Innovapro's benefit. Id.

6) Innovapro entered into an agreement with Paragon to continue its representation of the Sandpiper brand to foster a "seamless" transition.   Id.

7) Innovapro initially operated Sandpiper out of the same location and continues to use the same website, email addresses, and phone numbers.   Id. at 22.

8) Innovapro purchased Sandpiper's vendor agreements with the military and did not independently qualify as a vendor prior to the asset purchase, although it completed the qualification process after the asset transfer.  Id. at 22-23.

9) Innovapro told Sandpiper customers that Sandpiper of California, Inc. had been dissolved, although Sandpiper had not actually "dissolved" but merely sold substantially all of its assets, ceased operations, and changed its name.  Id. at 23.

10) For a few months after the asset purchase, Innovapro sold the wallet series of products, which had been recalled from AAFES locations, into exchanges for the Marines and Navy, but ultimately attempted to recall the items.  Some of the wallets still remain in military exchange stores.  Id. at 23.

11) In the APA, Innovapro assumed liabilities necessary for continuation of the business but disclaimed liability for any threatened or pending litigation.  The APA acknowledged the existence of the FTC action, and potential liability for "selling products falsely claiming or implying that they were made in America," "class action by purchases of wallets" and "removal of country of origin identifiers."  See id. at 24; see also APA, Schedule 21(E).

Significantly, none of these arguments undermine the legitimacy of Innovapro's evidence that it purchased Sandpiper's assets in satisfaction of the debt.  Instead, Advantus appears to contend that the Court should infer fraud from the fact that Innovapro retained or re-hired Sandpiper employees, re-engaged Paragon, took over the AAFES contracts, and now continues to sell Sandpiper brand products.  Advantus provides no legal support for its contention that Innovapro's continued operation of the business after purchasing its assets evidences a fraudulent intent, and given that control and ownership of the company has changed, this evidence fails to raise an inference of fraud.[21]

Moreover, the mere fact that Innovapro and Sandpiper were aware of the FTC action and Sandpiper's potential liability for false advertising does not raise an inference of fraud.  See Jacksonville Bulls Football, Ltd. v. Blatt, 535 So. 2d 626, 629 (Fla. 3d Dist.

---

[21] Likewise, to the extent Advantus alleges that Innovapro continued to engage in false advertising for a limited time period after the asset transfer, Advantus can and does pursue Innovapro directly for this conduct.  Advantus fails to demonstrate how this activity undermines the legitimacy of the asset purchase.

Ct. App. 1988) ("[T]he mere fact that suit is pending against a person, or that a person is indebted to another, does not in and of itself render fraudulent that person's conveyance of property."); Nelson v. Cravero Constructors, Inc., 117 So. 2d 764, 766-67 (Fla. 3d Dist. Ct. App. 1960) ("The mere proof of the transfer of assets by an insolvent debtor or one whose insolvency is imminent, to creditor in payment of an antecedent debt does not in itself constitute fraud or that the transfer was intended by the debtor to defeat the claims of other creditors.").   Indeed, "it is not fraudulent to give [a debtor's assets] to some but not all existing creditors, even though the effect might be to injure or prejudice an existing creditor who was not chosen to receive the debtor's largesse."   Jacksonville Bulls Football, Ltd., 535 So. 2d at 629; see also Mitutoyo Am. Corp. v. Suncoast Precision, Inc., No. 8:08-mc-36-T-TBM, 2011 WL 2802938, at *4 (M.D. Fla. July 18, 2011).   Such "preferential transfers are not deemed fraudulent even though their natural effect is to hinder or delay the non-preferred creditors."   Jacksonville Bulls Football, Ltd., 535 So. 2d at 629; see also Wyzard v. Goller, 28 Cal. Rptr. 2d 608, 611-12 (Cal. Ct. App. 1994).

Advantus' most compelling argument in support of its theory that this transfer evidences a conspiracy is its contention that Innovapro allowed Jacobs and PiperGear to "loot" Sandpiper prior to the asset sale.   However, this too, is not supported by the evidence.   Jacobs testified that he started personally borrowing money from Sandpiper as far back as 2006 or 2007.   See Jacobs Dep. at 115-16.   Likewise, Sandpiper "loaned" funds to PiperGear at the time it was incorporated so it could begin doing business, see Second Jacobs PiperGear Decl. ¶ 2, and it appears that funds continued to flow back and forth between the two entities for several years.   See Sur-Reply, Ex. A (Doc. 102). Notably, however, after Sandpiper and Innovapro executed the July 6, 2018 Extension

Agreement whereby Sandpiper granted Innovapro a security interest in its assets, and Wu gained oversight of the operation of Sandpiper's business, this flow of funds between Sandpiper and PiperGear almost entirely stopped. See id., Ex. A at PG000004 (Intercompany Transaction Report reflecting only one transaction after June 30, 2018).

Significantly, as part of the APA, Innovapro expressly declined to purchase these purported loans from Sandpiper. See APA 1.B.(iv)-(v). Thus, Innovapro did not "forgive" those debts, as would be indicative of a fraudulent intent to allow Jacobs and PiperGear to loot the company without recourse from future creditors. See Response at 20. Rather, because Innovapro did not purchase the loans, it was Sandpiper (through Jacobs) that forgave the loans, and to the extent Advantus contends that this was fraudulent, the APA does not deprive Advantus of the ability to pursue DBJ Enterprises, Jacobs, or PiperGear for relief. The fact that Innovapro elected not to attempt to recoup those funds in satisfaction of its debt, purchasing other assets instead, does not support an inference that the APA was a fraudulent transaction. Likewise, although Jacobs entered into a lucrative two-year consulting agreement with Innovapro as part of the APA, he did so in conjunction with a five-year non-compete agreement. See APA, Schedules 8 and 9. Advantus cites no authority to suggest that this arrangement is indicative of fraudulent activity.

As stated above, Advantus, as the plaintiff, bears the burden of establishing a prima facie case of personal jurisdiction over Innovapro. Advantus' allegations of conspiracy are largely conclusory, and to the extent Advantus does plead specific facts in support of its conspiracy claim, Innovapro has come forward with evidence rebutting those allegations. As such, the burden shifted back to Advantus to present sufficient evidence

of personal jurisdiction to withstand a motion for directed verdict. Upon consideration of the evidence presented, even viewing the inferences in favor of Advantus, the Court finds that Advantus fails to meet its burden.[22] The Court emphasizes that this is not a finding on the merits, as Advantus has not had a full opportunity to conduct discovery at this stage of the proceedings. Indeed, Advantus is free to pursue its conspiracy claim in a court with personal jurisdiction over Innovapro. Nonetheless, absent evidence sufficient to raise a material issue of fact on this issue, Advantus has failed to carry its burden of establishing that this Court has personal jurisdiction over Innovapro as to the alleged conspiracy claim.

### c. Voidable Transaction – Count V

For the same reasons stated above as to Sandpiper, the Court finds that the Florida long-arm statute does not extend so far as to provide personal jurisdiction over the voidable transaction claim. A claim to void a transfer of assets is not a tort within the meaning of the long-arm statute, and even to the extent Innovapro has conducted some business activities in Florida, the purported voidable transaction did not arise out of those contacts.

### 3. PiperGear

In the Complaint, Advantus alleges that Sandpiper and PiperGear jointly engaged in false advertising. See Complaint ¶¶ 13, 31. In addition, Advantus asserts that Sandpiper, PiperGear, and Innovapro "operated as a common enterprise," id. ¶ 32, and Advantus names PiperGear in the civil conspiracy claim set forth in Count IV. PiperGear

---

[22] The Court emphasizes that this standard of review differs from that applied to a Rule 12(b)(6) motion to dismiss for failure to state a claim in that the Court does not merely accept the allegations of the Complaint. Rather, "[w]here, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction . . . ." See Meier, 288 F.3d at 1268-69. Although the Court "must construe all reasonable inferences in favor of [Advantus]," it is Advantus' burden to present "enough evidence to withstand a motion for directed verdict." Id. at 1269.

moves to dismiss for lack of personal jurisdiction arguing that PiperGear "does not conduct business in Florida; does not have an office, agent, or property in Florida; does not advertise or solicit business in Florida; and does not nor [sic] create, control, or employ the distribution system that brings their products into Florida." See PiperGear Motion at 17. Advantus responds that PiperGear is subject to personal jurisdiction in this Court based solely on its contention that PiperGear engaged in a conspiracy with Sandpiper and Innovapro. See Response at 15-18. In its Reply, PiperGear contends that "the record and the facts do not substantiate" the existence of a conspiracy with PiperGear. See PiperGear Reply at 4-5. As stated above, Advantus may exercise personal jurisdiction over PiperGear, as a non-resident co-conspirator, if Advantus has "successfully alleged a cause of action for conspiracy among the defendants to commit tortious acts toward the plaintiff, and if the plaintiff has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy . . . ." See NHB Advisors, Inc., 95 So. 3d at 448.

In the Complaint, Advantus alleges that both Sandpiper and PiperGear made misleading representations in "their" catalogs, disseminated false information directly to consumers, and misrepresented that their products were compliant with the Berry Amendment. See Complaint ¶¶ 13b.-c., e., f. Advantus further alleges that Sandpiper made misleading statements specifically about PiperGear on its website and social media pages. See id. ¶¶ 13.a, d. In addition, Advantus asserts that Sandpiper and PiperGear "share a common website, sandpiperca.com, as well as use joint catalogues to sell the products bearing their respective trademarks," and that Sandpiper has "for years

advertised that PiperGear is its 'sister company.'"   Id. ¶ 31.   In addition, Advantus

supports these allegations of conspiracy with the following evidence:

1) David Jacobs is the president and sole owner of both Sandpiper and PiperGear. The same person, Morton Hollaender, serves as CFO for both companies as well.   Sandpiper and PiperGear also appeared to share several employees, and Jones used a two-sided business card, produced by Sandpiper, that represents both Sandpiper and PiperGear.   See Response at 16.

2) PiperGear manufactured numerous products sold under the Sandpiper brand. However, PiperGear records do not list Sandpiper as a customer, and PiperGear did not separately invoice Sandpiper for these products.   Id. at 17.

3) Sandpiper "loaned" PiperGear millions of dollars, but these loans are not documented in promissory notes, or reflected in Sandpiper's accounts receivable or PiperGear's accounts payable.   Id. at 17-18.

4) Sandpiper promoted PiperGear as its "sister" company and the means by which Sandpiper was able to offer U.S.-made products.   Sandpiper utilized PiperGear's trademarked logos on its website and referred to PiperGear's manufacturing facility as "our US manufacturing plant."   These representations were also present in Sandpiper's catalogs, on its LinkedIn page, and on PiperGear's website.   Id. at 16.

5) Sandpiper promoted its connection to PiperGear in its presentation to the AAFES buyer regarding the wallet program.   The presentation referred to "our US manufacturing plant" and appears to have included pictures of PiperGear's manufacturing equipment.   Id. at 17.

Significantly, PiperGear does not present any evidence refuting Advantus'

allegations supporting its claim that the companies formed a conspiracy to engage in false

advertising.   In his Declaration on behalf of PiperGear, Jacobs asserts that PiperGear has

"no influence or right regarding where the products [manufactured by PiperGear on behalf

of other companies] are then taken or delivered to be sold," and that PiperGear has "no

knowledge, influence, or right regarding the location, identity, or other characteristics of

the final end user of the products."   See Jacobs PiperGear Decl. ¶ 5.   However, Jacobs

does not refute the contention that PiperGear was involved in the allegedly false or

misleading advertising and promotion of Sandpiper products as being manufactured in the USA. Indeed, Sandpiper's pervasive use of PiperGear's name and trademarks supports the inference of an agreement between Sandpiper and PiperGear to engage in the allegedly false advertising. Accordingly, at this stage of the proceedings, the Court finds that Advantus has satisfied its burden of presenting evidence of a conspiracy between Sandpiper and PiperGear.[23] Moreover, Advantus presents evidence that a member of the conspiracy engaged in tortious acts in Florida through Sandpiper's actions in distributing the wallets with allegedly misleading labels in Florida, see Notice, Ex. 20, as well as placing allegedly false or misleading advertisements on its website from which it sold products into Florida. See Jacobs Sandpiper Decl. ¶ 16; Wu Decl. ¶ 43; Notice (Doc. 47), Exs. 60, 62. Accordingly, not prejudging the ultimate merit of Advantus' claim, the Court finds Advantus has met its burden of establishing personal jurisdiction over PiperGear as a co-conspirator with Sandpiper.

## IV. Venue

Innovapro also moved to dismiss for improper venue. As with personal jurisdiction, "'[w]here a complaint contains multiple claims, venue must be established for each individual claim and each defendant.'" See Maid to Perfection Global, Inc. v. Miller, Case No. 6:18-cv-463-Orl-22GJK, 2018 WL 8244570, at *3 (M.D. Fla. Aug. 22, 2018) (quoting Vivant Pharm., LLC v. Clinical Formula, LLC, No. 10-21537-CIV, 2011 WL 1303218, at *2 (S.D. Fla. Mar. 31, 2011)). Pursuant to 28 U.S.C. § 1391(b), "[a] civil action may be

---

[23] Notably, in its Response, Advantus focuses on the existence of an agreement between Sandpiper and PiperGear. See Response at 15-18. As stated above, at this stage of the proceedings Advantus has failed to demonstrate that Innovapro joined in the conspiracy. The parties have not argued, and thus the Court will not consider at this time, whether Sandpiper and PiperGear, as sister companies wholly-owned by the same individual, are legally capable of conspiring with each other under the intracorporate conspiracy doctrine.

brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." This statute further provides that defendants such as the corporations named in this lawsuit, "shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question . . . ." See 28 U.S.C. § 1391(c)(2). Because the Court has personal jurisdiction over all Defendants as to Counts I-III, venue is proper in this district as to those claims. See 28 U.S.C. § 1391(b)(1), (c)(2).

As to Counts IV and V, however, for the reasons stated above the Court lacks personal jurisdiction over Innovapro as to Count IV, and over both Innovapro and Sandpiper as to Count V. Notably, where a court finds personal jurisdiction lacking, the Court has the authority under 28 U.S.C. § 1406 to transfer those claims, if warranted by the interests of justice, regardless of whether venue is proper. See Manley v. Engram, 755 F.2d 1463, 1467 & n.8 (11th Cir. 1985); Irving v. Bd. of Chosen Freeholders of Burlington Cnty., N.J., No. 1:18-CV-02845-RWS, 2019 WL 955359, at *5 (N.D. Ga. Feb. 26, 2019).[24] As the former Fifth Circuit Court of Appeals explained in Dubin, "§ 1406 operates when there exists an obstacle—either incorrect venue, absence of personal jurisdiction, or both—to a prompt adjudication on the merits in the forum where originally brought." See Dubin v. United States, 380 F.2d 813, 816 (5th Cir. 1967);[25] Aguacate

---

[24] The Court notes that 28 U.S.C. § 1631 also permits "transfer of a case whenever a court determines there is a 'want of jurisdiction' so long as the transfer is in the interest of justice." See Crowe v. Paragon Relocation Resources, Inc., 506 F. Supp. 2d 1113, 1125 (N.D. Fla. 2007). However, courts are split on whether this statute applies to both personal and subject matter jurisdiction. Id. at 1125 n.23; see also Irving, 2019 WL 955359, at *5 ("The Court recognizes that, although § 1631 clearly applies when subject matter jurisdiction is lacking, courts are divided on whether § 1631 also allows transfer of a case to cure a lack of personal jurisdiction."). Because it makes no difference whether the Court utilizes § 1631, § 1404, or § 1406 to transfer those claims over which it lacks personal jurisdiction, the Court need not resolve this issue.

[25] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit

Consol. Mines, Inc. of Costa Rica v. Deeprock, Inc., 566 F.2d 523, 524 (5th Cir. 1978) (explaining that Dubin "interpreted s. 1406 to permit transfer of cases having proper venue but lack of personal jurisdiction"); see also Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962) (finding that a court may transfer a case pursuant to § 1406 "whether the court in which it was filed had personal jurisdiction over the defendants or not"); KVAR Energy Sav., Inc., 2009 WL 103645, at *15 n.12 ("A court may consider a motion to transfer even when personal jurisdiction is found lacking over certain defendants.").   Here, as discussed more fully below, the Court finds the interests of justice warrant transfer of this case to the Southern District of California, where the court will have jurisdiction over the entirety of this action, and most of the actions giving rise to this case occurred.   As such, the Court need not determine whether venue is proper as to Counts IV and V, because regardless of which provision is used—§ 1406, § 1404, or § 1631—the result is the same.   See 15 Wright & Miller, supra, §§ 3827 (4th ed. 2013) (explaining that where personal jurisdiction is lacking, "very few litigants will care whether the court purports to proceed under Section 1404(a) or Section 1406(a) in transferring to a district where personal jurisdiction can be exercised over the defendant"); id. § 3842 ("[I]n a case transferred from a district court lacking personal jurisdiction—regardless of the statute used to achieve that result—the law of the transferee court will be applied.").

V.   **Transfer – 28 U.S.C. § 1404(a)**

   A. **Applicable Law**

As to the remaining claims, Defendants each request transfer of this case pursuant to 28 U.S.C. § 1404(a).   Section 1404(a) provides that "[f]or the convenience of parties

_____

adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The standard for transfer under § 1404(a) gives broad discretion to the trial court. See Am. Aircraft Sales Int'l, Inc. v. Airwarsaw, Inc., 55 F. Supp. 2d 1347,1351 (M.D. Fla. 1999). In considering whether to transfer a case pursuant to § 1404(a), in the absence of consent among the parties, the district court must engage in a two-step inquiry. See 28 U.S.C. § 1404(a); Eye Care Int'l, Inc. v. Underhill, 119 F. Supp. 2d 1313, 1318 (M.D. Fla. 2000); Mason v. Smithkline Beecham Clinical Labs., 146 F. Supp. 2d 1355, 1359 (S.D. Fla. 2001). The court must first determine, as a threshold matter, whether the case could have been filed in the proposed district. See Bookworld Trade v. Daughters of St. Paul, Inc., 2006 WL 3333718, at *1 (M.D. Fla. Nov. 16, 2006); see also Colo. Boxed Beef Co. v. Coggins, No. 8:07-cv-00223-T-24-MAP, 2007 WL 917302, at *3 (M.D. Fla. Mar. 23, 2007). Next, the court must consider "whether the transfer would be for the convenience of the parties and witnesses and in the interest of justice." Eye Care Int'l, Inc., 119 F. Supp. 2d at 1318; see also Bookworld Trade, 2006 WL 3333718, at *1. In making this determination, the court evaluates a number of factors. See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988).

As to the first step, it is undisputed that this case could have been brought in the Southern District of California where all three Defendants reside. Thus, the Court turns to the second step of the analysis. As to this step, the Eleventh Circuit Court of Appeals has identified nine factors to consider in determining whether transfer is appropriate:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of

the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

Manuel v. Convergys Corp., 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). No single factor is dispositive, although some factors carry more weight than others. See Summers-Wood L.P. v. Wolf, No. 3:08-cv-60/RV/MD, 2008 WL 2229529, at *2 (N.D. Fla. May 23, 2008).

It is the movant's burden to establish that a case should be transferred to the suggested forum in the interests of convenience and justice. See In re Ricoh Corp., 870 F.2d 570, 573 (11th Cir. 1989) ("[T]he burden is on the movant to establish that the suggested forum is more convenient."); Colo. Boxed Beef Co., 2007 WL 917302, at *3. Moreover, "[i]n determining the propriety of transfer, the Court must give considerable weight to Plaintiff's choice of forum. Only if the Plaintiff's choice is clearly outweighed by considerations of convenience, cost, judicial economy, and expeditious discovery and trial process should this Court disregard the choice of forum and transfer the action." Response Reward Sys., L.C. v. Meijer, Inc., 189 F. Supp. 2d 1332, 1339 (M.D. Fla. 2002) (internal citations omitted); see also In re Ricoh Corp., 870 F.2d at 573 ("[F]ederal courts traditionally have accorded a plaintiff's choice of forum considerable deference."); Robinson, 74 F.3d at 260 ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.").[26] Upon consideration of all of the factors, the Court determines that transfer of the case is warranted.

---

[26] 28 U.S.C. § 1404(a) was amended in 2011 to permit transfer "to any district or division to which all parties have consented." While these cases were decided prior to this amendment, the analysis of § 1404(a)'s convenience and public interest factors remains applicable.

## B. Analysis

A significant factor under § 1404(a) is the convenience of witnesses, "and the moving party must make a specific showing of inconvenience to witnesses to succeed in requesting a venue transfer." Laica-Bhoge v. Eli Lilly & Co., No. 6:14-CV-1286, 2015 WL 3919515, at *5 (M.D. Fla. June 25, 2015) (quoting Elec. Transaction Network v. Katz, 734 F. Supp. 492, 501-02 (N.D. Ga. 1989) (internal quotations omitted)). Notably, neither party has submitted a comprehensive list of proposed witnesses. "[A] general allegation that witnesses will be necessary, without identifying those necessary witnesses and indicating what their testimony at trial will be," does not merit transfer. Laica-Bhoge, 2015 WL 3919515 at *5 (quoting J.I. Kislak Mortg. Corp. v. Connecticut Bank and Trust Co., 604 F. Supp. 346, 347 (S.D. Fla. 1985)). This is so because, in analyzing the convenience to non-party witnesses, the Court must determine whether a witness is 'key.' See Mason, 146 F. Supp. 2d at 1361-62. A witness is key if his or her testimony is likely to be significant enough that the witness' presence would be necessary at trial. See id. Additionally, in the case of employee witnesses, "their convenience is entitled to less weight because [the parties] will be able to compel their testimony at trial." Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc., 761 F. Supp. 2d 1322, 1327 (M.D. Fla. 2010).

Here, it appears that the key witnesses in this case are predominately located in California. However, these witnesses are largely employees of Defendants, such that their convenience is entitled to less weight. Moreover, at least one significant employee-witness, Jones, is located in Florida. As to non-party witnesses, there are several significant non-party witnesses who live in Texas—namely, the Paragon sales

representatives who made the sales presentations to the military buyers, and the AAFES buyers who heard those presentations.  As such, the location of these witnesses weighs neither in favor of, nor against, transfer.  In addition, Sandpiper and PiperGear maintain that former employees involved in the advertisement, manufacture, and sale of products, former officers who dealt with Sandpiper's financials, and persons involved in the transaction with Innovapro are all critical witnesses to its defense who primarily reside in the Southern District of California. <u>See</u> Sandpiper Reply at 11-12; Jacobs Sandpiper Decl. ¶ 31; Jacobs PiperGear Decl. ¶ 20.  For its part, Innovapro identifies specific individuals with knowledge of the asset transfer who are located in California.  <u>See</u> Wu Decl. ¶ 62.

In Response, Advantus maintains that the merchandisers "who had direct contact with store managers and consumers are the most significant witnesses," and three of Sandpiper's former merchandisers live in Florida.  <u>See</u> Response at 32.  The Court questions the importance of the testimony of the merchandisers given that Advantus' allegations largely pertain to misleading advertisements on the internet, in catalogs (which merchandisers did not have), and in sales presentations to the military buyers.  And, to the extent Advantus believes that merchandisers who had "direct contact with store managers and consumers" are significant to this case, the merchandisers who would have had the most interaction with store managers and consumers are those who serviced the largest military exchange stores, located outside Florida.  Thus, Advantus has identified only one witness in Florida who may have significant testimony—Jones.  The remainder of the significant witnesses in this case are in neutral locales outside Florida, or in California.  Thus, the Court finds this factor to weigh in favor of transfer, albeit only slightly,

given that the majority of the witnesses in California are employees whose testimony in Florida can be compelled.

Modern technology has reduced the importance of the location of relevant documents and the relative ease of access to sources of proof. See <u>Trinity Christian Ctr. of Santa Ana, Inc.</u>, 761 F. Supp. 2d at 1327. According to Jacobs, all of the evidence with which Sandpiper and PiperGear will defend themselves is in California. <u>See</u> Jacobs Sandpiper Decl. ¶ 30; Jacobs PiperGear Decl. ¶ 19. Indeed, PiperGear's "manufacturing equipment and process is housed in California, and all products in various stages of completion are located in California." <u>See</u> Jacobs PiperGear Decl. ¶ 19. Advantus contends that Jones has "reports, photographs, and other materials his field representatives sent to him," which he maintains at his home office in Florida. <u>See</u> Response at 34. While Jones may have some documents in Florida, Advantus fails to explain what relevance these inventory checklists and planogram pictures will have to the allegations in this case. As stated above, Advantus' allegations predominately relate to misleading advertisements on the internet, in catalogs (which the in-store merchandisers did not use), and misrepresentations made orally to the military buyers regarding PiperGear's manufacturing capabilities. Because PiperGear's manufacturing equipment is located in California, and all other relevant evidence appears to be easily transmissible documents and photographs, the Court finds this factor weighs slightly in favor of transfer.

The convenience of the parties is a neutral factor. Defendants are all California citizens, so litigating the case in California would be more convenient for them. Advantus, on the other hand, is located in Florida, such that remaining in this venue is more convenient for it. However, as to the relative means of the parties, Advantus enjoys

significantly more resources than PiperGear and Sandpiper.  See Jacobs PiperGear Decl. ¶ 22; Jacobs Sandpiper Decl. ¶ 33; Second Jacobs Sandpiper Decl. ¶ 3.  Nonetheless, Sandpiper and PiperGear have not shown that litigating in this forum would be unduly burdensome.  While Sandpiper has no remaining assets or income, it is owned by the same individual who owns PiperGear, which has generated $3.5 million per year in annual sales for the past five years.  See Jacobs PiperGear Decl. ¶ 22.  Thus, this factor does not weigh in favor of transfer.

As to the forum's familiarity with the governing law, this factor weighs against transfer.  Advantus brings a federal cause of action, three state law claims premised on Florida law, and one state law claim premised on California law.  Although both this Court and a federal court in California are fully capable of applying the law governing each claim, this court certainly is more familiar with Florida law which plays a larger role in this controversy.

Turning next to the locus of operative facts, Advantus contends that "there are multiple loci of operative facts," one of which is Florida, such that this factor is neutral and does not support transfer.  See Response at 35.  The Court is not persuaded.  When analyzing this factor in false advertising cases, "some courts consider the location where the accused material was distributed while other courts focus on the location where it was designed or created."  See Brasseler USA Dental, L.L.C. v. Discus Dental, Inc., No. 04 Civ.9404 (NRB), 2005 WL 1765706, at *3-4 (S.D.N.Y. July 25, 2005).  In this case, given Advantus' allegations of a conspiracy to engage in the false advertising and a fraudulent attempt to avoid liability through an asset sale, the Court finds the focus of this case will be Sandpiper, PiperGear and Innovapro's activities in California—the existence, or lack

thereof of PiperGear's domestic manufacturing activities, the formation of an alleged agreement among individuals in California to engage in false advertising, and ultimately the events leading up to and circumstances surrounding the asset transfer.   Indeed, the knowledge and intent of each Defendant in developing the alleged false advertisements and agreeing to the asset transfer will be significant.   As such, perhaps more so than in a standard false advertising case, the events in California where the advertisements were created will be a significant focus of this lawsuit.   While the purportedly misleading advertisements were accessible in Florida, and the related products were sold in Florida, there is nothing unique about Florida's role in this dispute beyond Advantus' location here. See id.   Indeed, Florida is a minor market for the products, and no more relevant to this case than any of the other places nationwide where potential Sandpiper customers purchased Sandpiper products in military exchange stores or accessed the Sandpiper website or social media pages.   Accordingly, the Court finds this factor weighs in favor of transfer.   See CYI, Inc. v. Ja-Ru, Inc., 913 F. Supp. 2d 16, 20-21 (S.D.N.Y. 2012); E. Mishan & Sons, Inc. v. Smart & Eazy Corp., 18 Civ. 3217 (PAE), 2018 WL 6528496, at *10-11 (S.D.N.Y. Dec. 12, 2018); Brasseler USA Dental, L.L.C., 2005 WL 1765706, at *3-4; see also Oscar Mayer Foods Corp. v. Bryan Foods, Inc., No. 1:89-CV-364-RHH, 1989 WL 164358, at *2-3 (N.D. Ga. July 20, 1989).

Finally, a plaintiff's choice of forum is given considerable deference such that it should be disregarded only where that choice is "clearly outweighed by considerations of convenience, cost, judicial economy, and expeditious discovery and trial process." Response Reward Sys., L.C., 189 F. Supp. 2d at 1339 (internal citations omitted); see also Ricoh Corp., 870 F.2d at 573 ("[F]ederal courts traditionally have accorded a plaintiff's

choice of forum considerable deference."); <u>Robinson</u>, 74 F.3d at 260 ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations."). Although consideration of the above factors might not outweigh the deference given Advantus' choice of forum, the Court finds that the interests of justice and trial efficiency make a transfer appropriate in this case.[27]    The Court has already determined that it lacks personal jurisdiction over Innovapro as to the conspiracy claim, and over both Innovapro and Sandpiper as to the voidable transaction claim.    As such, if the Court declines to transfer the case, it would be obligated to dismiss part of this case and address the merits of the remaining claims, thereby virtually ensuring that two separate courts would address this controversy, and the witnesses necessarily would be involved in two separate actions thousands of miles apart.    Transfer avoids these extremely inefficient results, including the significant burden to the witnesses, as well as the potential for inconsistent outcomes. It is in the interest of all parties involved, Advantus included, to have one court address all of Advantus' claims arising from the same facts in a single proceeding.    See <u>Hampton-Muhamed v. James B. Nutter & Co.</u>, 687 F. App'x 890, 892 (11th Cir. 2017); <u>Chicken Kitchen USA, LLC v. Tyson Foods, Inc.</u>, Case No. 17-21503-CIV-WILLIAMS, 2017 WL 6760811, at *3-4 (S.D. Fla. Oct. 4, 2017) ("'Courts consider many things relevant to the interest of justice.    One frequently mentioned is the desire to avoid multiplicity of litigation

---

[27] The Court notes that both the Middle District of Florida and the Southern District of California have relatively heavy caseloads (the Southern District of California ranks thirteenth nationally in total filings per judgeship, while the Middle District of Florida ranks fifteenth in that category, <u>see</u> Federal Court Management Statistics, June 2019, <u>available at</u> <u>http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2019</u>), and they have nearly identical median times from filing to disposition of civil cases for the 12-month period preceding June 2019 (6.1 months for the Southern District of California versus 6.0 months for the Middle District of Florida, <u>see id.</u>).    While California has a slightly longer median time from filing to trial (27.7 months in California, compared to 22.3 months in Florida), it has fewer pending cases (443 to 551) and typically fewer weighted filings (most recently, 605 to 648).    <u>Id.</u>

resulting from a single transaction or event.'" (quoting 15 Wright & Miller, <u>supra</u>, § 3854 (4th ed. 2013))).

Upon consideration of all of the relevant factors, the Court concludes that transfer of this case to the Southern District of California is appropriate. Because transfer allows the entire case, as to all Defendants, to be decided by a single court, and most witnesses, the manufacturing facilities, and the locus of operative facts are in California, the Court is convinced that transfer is warranted here. In light of the foregoing, it is

**ORDERED:**

1. Defendant PiperGear USA, Inc.'s Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 22) and Defendant Sandpiper of California, Inc.'s Motion to Dismiss, or in the Alternative, Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) (Doc. 23) are **GRANTED, in part, and DENIED, in part.**

   A. Defendants' Motions are **GRANTED** to the extent the Court directs the Clerk of the Court to transfer this case to the Southern District of California.

   B. The Motions are otherwise **DENIED**.

2. Defendant Innovapro Corporation's Motion to Dismiss (Doc. 20) is **GRANTED** as to its request for transfer, **DENIED without prejudice** to renewal in the transferee court as to its request for dismissal under Rule 12(b)(6), and otherwise **DENIED**.

3.  The Clerk of the Court is **DIRECTED** to transfer this action to the United States District Court for the Southern District of California, and close this file.

**DONE AND ORDERED** in Jacksonville, Florida this 30th day of September, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record